**In re P.G. REALTY COMPANY, Debtor.**

**Bankruptcy No. 094–70720–511.**

United States Bankruptcy Court,
E.D. New York.

April 28, 1998.

Thaler & Gertler, L.L.P. by Richard G. Gertler, Harold J. Levy, Westbury, NY, for Debtor.

Paul A. Crotty by Kathleen J. Cahill, Corporation Counsel of City of New York, New York City.

## OPINION

### (Motion to Determine Tax Liability Pursuant to 11 U.S.C. §§ 505, 506)

MELANIE L. CYGANOWSKI, Bankruptcy Judge.

P.G. Realty Company ("PG" or "Debtor"), a New York partnership, filed a voluntary petition for relief under Chapter 11 on March 25, 1994. Its sole partners are Phyllis and Golda Golub.[1] At the time of the filing, PG owned a commercial building located at 700 East 98th Street, Brooklyn, New York (the

"Property"), valued on Schedule A at $400,000.00 and unencumbered by any mortgages. *See* Schedules A, D; Affidavit Pursuant to Local Bankruptcy Rule 11 at ¶ 10. PG owned no other assets, and had only one creditor scheduled apart from the taxing authorities: GAG Construction Corp., an unsecured creditor owed $8,500.[2] *See* Schedule F. GAG has not filed a proof of claim in this case, despite the existence of and notice of a bar date. According to PG's Local Rule 11 affidavit and its proposed disclosure statement, its bankruptcy filing was caused by the following events:

- When PG bought the Property sometime in 1986, there was approximately $42,000 owed to the City of New York, Department of Finance (the "City") for unpaid real estate taxes, which debt PG assumed as part of the purchase.
- Thereafter, PG and the City entered into an *In rem* Installment Agreement (the "Agreement") requiring PG to pay the taxes over a period of years in quarterly payments. PG made the payments for several years, but at some point, its tenant defaulted on its lease, leaving PG without income to pay its obligations under the Agreement.
- The City commenced foreclosure proceedings based upon PG's default, and PG therefore filed its bankruptcy petition.

Nine months after the filing, the Debtor sought permission to sell the Property free and clear of liens for the sum of $265,000, to be paid under the following terms: $15,000 cash deposit; a $35,000 lump sum cash payment at closing; and the balance ($215,000) in the form of a four-year purchase money mortgage bearing interest at 10%. The purchaser was to pay interest only in equal monthly installments during the term of the mortgage, with a balloon payment of the principal at the end of four years. The Debtor also moved, pursuant to 11 U.S.C. § 505, to fix the tax liability owed to the City at

---

1. Golda Golub is also a debtor before this Court. *See* Case No. 095–70600–511.

2. On May 13, 1994, the Court entered an Order fixing June 24, 1994 as the last date by which creditors could file claims and share in a distribution of the estate. The only claim filed was on

December 4, 1995—more than a year later—by CMA Design Studio, P.C. in the sum of $6,829.48; the claim allegedly arises from an Agreement dated August 11, 1994 for architectural services to enable PG to obtain a certificate of occupancy for the Property.

$18,220.82. Both motions were granted. It was subsequently determined, however, that service upon the City was defective, and the parties entered into a stipulation, later approved by the Court, which provided in relevant part as follows:

WHEREAS, the City of New York asserts that as of March 22, 1995 there is a tax liability in the amount of $113,573.39;

WHEREAS, the debtor asserts that the tax liability owed to the City of New York does not exceed the sum of $18,220.82 as previously determined by the Court;

\*\*\*

WHEREAS, a prolonged delay of the closing for the sale of the subject property may provide grounds for the Buyer to cancel the contract and avoid the purchase of the subject property;

IT IS HEREBY STIPULATED and agreed as follows:

1. The City of New York consents to the sale of the subject property and to the transfer of title free and clear of its liens;

2. The liens of the City of New York shall affix and attach to all proceeds of the sale, including the proceeds in the escrow account holding the initial deposit of $15,000.00, and to the purchase money mortgage provided to the Debtor and to the proceeds derived from the purchase money mortgage provided the debtor;

3. All post-petition real property taxes and related charges including interest thereon shall be fully paid at closing from the proceeds available from the sale of the subject property ... and, assuming the Court determines additional tax liability is owing, a plan of reorganization shall provide for payment of at least one-half of the remaining proceeds received from the sale of the property, after payment of administrative expenses as allowed by the Court, payment of at least three-quarters of the monthly mortgage payments, and payment

of the balance of the tax liability, if any, from the balloon payment of the mortgage to the City of New York....

\*\*\*

5. Both the City of New York and the debtor reserve their rights to resolve, settle or litigate the issue of what, if any, taxes are owed by the debtor to the City of New York and the appropriate amount of the lien, if any, which shall affix to the proceeds of the sale....

Several months later, the Debtor filed the present motion, pursuant to 11 U.S.C. § 505, for an order determining the Debtor's tax liability to the City, contending that after nearly seven years of making payments under the *In Rem* Agreement, it "found itself owing ... more of an amount than when it first started paying off its tax obligations." *See* Affidavit of Howard Golub, sworn to Dec. 6, 1995, ¶ 12. The Debtor raises a variety of objections to the City's computation of its liability under the Agreement and asserts that the Agreement is "riddled with ambiguities." The motion is supported by the affidavit of Bernard J. Sandler, a partner in the firm of Sandler, Rosengarten, Denis & Berger, LLP, the Debtor's duly retained certified public accounting firm. The affidavit states, in effect, that use of the City's method of calculation of interest results in the Debtor owing more at the end of the Agreement than it owed at the beginning of the Agreement.

The motion also seeks to reduce the interest rate on prepetition taxes allegedly owed for periods subsequent to the execution of the Agreement. The City's claim to interest on taxes accruing after the Agreement but prior to the bankruptcy filing can be broken down into the following constituents: (1) interest which accrued prepetition pursuant to Section 11–224 of the New York City Administrative Code ("Administrative Code")[3], and

---

**3.** Section 11–224(g) of the Administrative Code provides in pertinent part:

No later than the twenty-fifth day of May of each year, the banking commission shall transmit a written recommendation to the council of a proposed interest rate to be charged for

nonpayment of taxes on real estate.... In making such recommendations the commission shall consider the prevailing interest rates charged for commercial loans extended to prime borrowers by commercial banks operating in the city and shall propose a rate of at

(2) interest which accrues postpetition, but preconfirmation, pursuant to 11 U.S.C. § 506(b). The City argues, of course, that the 18% statutory rate, compounded daily as set forth in the Administrative Code, is the appropriate figure for both time periods. The Debtor does not challenge the City's right to charge 18% compounded daily prepetition,[4] but attacks its right to charge 18% interest, compounded daily, under 11 U.S.C. § 506(b).

The City opposed the Debtor's motion and both sides briefed the issues, following which the Court reserved decision. Although PG initially urged the Court to decide the motion expeditiously, the parties advised the Court while the matter was *sub judice* that they were engaged in settlement negotiations.

Those discussions bore some fruit, and as a result of a settlement placed upon the record on October 16, 1997, all arguments regarding the calculation of taxes and interest under the Agreement were consensually resolved. Therefore, the only remaining issue is whether or not the City is entitled to postpetition interest at the rate of 18%, compounded daily, on unpaid prepetition taxes.[5]

The Debtor argues that the Court need not allow postpetition interest on the City's claim at the rate set forth in the Administrative Code; rather, the Debtor contends that the federal judgment rate is more appropriate. In addition, the Debtor contends that although the charge is labeled as "interest" by the Administrative Code, some portion of it is a disguised penalty. Lastly, the Debtor alleges that the compounded rate set forth in the Administrative Code is criminally usurious under New York's Penal Code.

The City counters that (a) in determining the appropriate rate of postpetition interest, the Court must look to state law which, in this case, dictates an 18% rate; (b) no portion of the 18% constitutes a penalty; and (c) it would be inequitable to reduce the City's interest rate, since the City is an "involun-tary" creditor and a sovereign seeking revenue to defray the costs of government.

## DISCUSSION

### A. The Claim for Taxes Accruing Prepetition and the Interest Rate to be Applied Postpetition

The allowance of postpetition interest is governed by 11 U.S.C. § 506(b), which provides:

> (b) To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose.

Section 506(b) affects "the quantum of the allowed secured claim and provides exception to the general rule that interest stops accruing as of the filing of the petition." *In re Harko*, 211 B.R. 116, 118 (2d Cir. BAP 1997), *aff'd sub nom. In re Milham*, 141 F.3d 420 (2d Cir.1998). Section 506(b) entitles an oversecured creditor to postpetition interest, which becomes part of the creditor's allowed claim. *Rake v. Wade*, 508 U.S. 464, 471, 113 S.Ct. 2187, 2191–92, 124 L.Ed.2d 424 (1993) (interest is "part of the oversecured claim under § 506(b)"). *See also In re Foertsch*, 167 B.R. 555, 560 (Bankr.D.N.D.1994) (section 506(b) allows the oversecured creditor to enhance its claim by adding to it postpetition interest); *In re Busone*, 71 B.R. 201, 203 (Bankr.E.D.N.Y.1987) (Goetz, J. (ret.)); *In re Hugee*, 54 B.R. 676, 678–79 (Bankr.D.S.C. 1985) ("The creditor is entitled to receive the contract rate of interest until the effective date of the plan—at which time the accumulated interest becomes a part of the allowed secured claim"). Thus, the "allowed amount" of the oversecured creditor's claim will include, for purposes of 11 U.S.C. § 1129, a

---

least six percent per annum greater than such rates....

**4.** In support of its motion, the Debtor states that it "has never disputed the City's right to charge its statutory compound interest rate prepetition— except under the Agreement." *See* Memoran-

dum of Law in Reply to the Brief of the City of New York Submitted May 2, 1996, and in Further Support of Debtor's Motion for a Determination of it Tax Liability ("Debtor's Mem."), at 2.

**5.** *See* Transcript of Hearing held on October 16, 1997, at 14–15.

sum representing postpetition interest. The interest allowed under § 506(b) accrues from the date the petition is filed until the effective date of the plan of reorganization. *In re Beare Co.*, 177 B.R. 883 (Bankr.W.D.Tenn. 1994); *see also In re Milham, supra*, at 423 (chapter 13 case).

■ Although bankruptcy courts were divided as to whether Section 506(b) entitled a creditor to postpetition interest only where such interest was provided for by agreement, *i.e.*, only to consensual creditors, the United States Supreme Court resolved the issue in *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989), when it held that nonconsensual, statutory, oversecured creditors are entitled to recover postpetition interest under 11 U.S.C. § 506(b). Accordingly, oversecured tax lien claimants such as the City are entitled to postpetition interest under Section 506(b). *See also In re Parr Meadows Racing Ass'n, Inc.*, 880 F.2d 1540, 1549 (2d Cir.1989) (county entitled to postpetition interest on tax lien claims under Section 506(b)).

Neither the language of § 506(b) nor *Ron Pair* dictates the *rate* of postpetition interest to be paid. *See In re Greensboro Lumber Co.*, 183 B.R. 316 (Bankr.M.D.Ga.1995). On that point, the cases remain divided. Some hold, without much fanfare, that where a lien is created by state statute, the rate of interest to be paid under Section 506(b) is the rate set forth in the statute which created the lien. *Id.* (holding that the IRS was entitled to the rate of interest set forth in the Internal Revenue Code on its oversecured tax lien claim); *In re Isley*, 104 B.R. 673 (Bankr.D.N.J.1989) (allowing interest at statutory 18% rate to county taxing authority); *In re Busone, supra* (allowing 12% statutory interest on county's tax claim). Others have simply assumed the same, without discussion. *See In re Parr Meadows Racing Ass'n, Inc., supra*, 880 F.2d at 1549 (county entitled to postpetition interest on tax lien claims at statutory rate under Section 506(b)).

Some courts have stated that despite the existence of a state statute fixing the interest to be paid on statutory liens, the court has discretion to engage in a sort of case-by-case equitable balancing analysis, wherein the competing interests of the secured and unsecured creditors are somehow harmonized. *See, e.g., In re Kalian*, 178 B.R. 308 (Bankr.D.R.I.1995)(stating, entirely in *dictum*, that a bankruptcy court has discretion to balance appropriately the interests of the lien claimant and those of junior creditors); *In re DeMaggio*, 175 B.R. 144 (Bankr.D.N.H. 1994) (the court may exercise discretion in determining the rate of interest, taking into consideration the "equities"); *In re Wasserman* 151 B.R. 4, 5 (D.Mass.1993) (in holding that the statutory rate failed to "provide the right balance between the interests of the creditors and the debtors," the court observed that it must "examine the equities," and interest at only the federal judgment rate would be allowed where unsecured creditors would be directly harmed by imposing interest at the statutory rate).

The approach taken by the apparent majority of courts is somewhat more restrictive. Most courts which have visited the issue have concluded that a bankruptcy court is not necessarily bound by the state statutory rate, but should be reluctant to deviate from that rate except in very limited circumstances. *See, e.g., In re Liuzzo, supra*, 204 B.R. 235, 239 (Bankr.N.D.Fla.1996) (creditors should receive the interest rate set forth in the statutes under which the liens arise, unless the debtor presents evidence that "the statutory interest rate is a penalty or the application of the statutory rate would lead to an inequitable or unconscionable result"); *In re Navis Realty, Inc.*, 193 B.R. 998, 1017–1018 (Bankr.E.D.N.Y.1996) (Holland, J.) (where, in connection with the same creditor and tax statute that are at issue here, the court held that a bankruptcy court should deviate from the statutory rate only where the statutory rate is a penalty, where imposition of the statutory rate would cause the unsecured creditors direct harm, and where it would impede the debtor's "fresh start"); *Galveston Indep. School Dist. v. Heartland Fed. Sav. & Loan Assoc.*, 159 B.R. 198, 204 (S.D.Tex. 1993) (holding creditors should be allowed the rate of interest dictated by the statutes under which their liens arise, "provided the charge can be reasonably characterized as true interest rather than a penalty").

The Court of Appeals for the Seventh Circuit in *In re Lapiana*, 909 F.2d 221 (7th Cir.1990), posited a classic law-school hypothetical to illustrate yet another situation in which deviation from the statutory rate would be appropriate, *i.e.*, where the IRS conspired with the trustee by compensating him to delay payments to the IRS and conceal the same from junior creditors, all for the purpose of allowing the IRS to earn a high interest rate at the expense of junior creditors. The actual facts in *Lapiana* were as follows: the bankruptcy court approved a sale of assets encumbered by an IRS lien and by a junior judgment lien, and ordered the proceeds paid to the IRS in partial satisfaction of its lien. The trustee did not do so for some twenty months (in fact, he had embezzled the rest). Thereafter, a second asset was sold, and the IRS claimed a right to all of the proceeds, since the unpaid tax plus interest which had accrued at the statutory rate exceeded the net proceeds of the second sale. The bankruptcy judge held that the government had forfeited its rights in seeking § 506(b) interest by dragging its feet in collecting the proceeds of the first sale. The Seventh Circuit framed the issue by inquiring whether *Ron Pair* completely extinguishes the power of a bankruptcy judge to abate an award of interest to an oversecured creditor. The court held that it does not, but concluded that an abatement of interest was not warranted on the facts of the case. In so doing, the Court of Appeals expressed its reluctance to deviate from the statutory rate:

It is true of course that bankruptcy, despite its equity pedigree, is a procedure for enforcing pre-bankruptcy entitlements under specified terms and conditions rather than a flight of redistributive fancy or a grant of freewheeling discretion such as the medieval chancellors enjoyed (equity itself is no longer a discretionary system in that sense). The government's tax claim against the [debtors] is one of those pre-bankruptcy entitlements and section 506(b) specifies one of the terms for enforcing it. But the specification need not be considered exhaustive. A rigid literalism is not the only alternative to discretionary justice. A statute that says "shall" does not, by its imperative mood, extinguish all defenses. We have no reason to suppose that the statute was intended to cut off the defense of estoppel and we may assume that other defenses, such as the statute of limitations, survive as well. The point of *Ron Pair* was to give involuntary liens parity with voluntary ones so far as the applicability of section 506(b) was concerned, rather than to abolish defenses against claims under that section.

But this is not to say that section 506(b) is an invitation to a free-for-all equity-balancing act. That would be a swing to the opposite extreme. We deprecate flaccid invocations of "equity" in bankruptcy proceedings. Creditors have rights, among them the right of oversecured creditors to post-petition interest, and bankruptcy judges are not empowered to dissolve rights in the name of equity. Flexible interpretation designed to allow the judicial interpolation of traditional defenses in a statute silent on defenses is one thing; standardless decision-making in the name of equity is another. *Ron Pair* makes clear that section 506(b) provides more than merely "guidance in the exercise of [the bankruptcy court's] equitable powers." If the statute were read merely to authorize the bankruptcy judge to award post-petition interest as a matter of grace, secured creditors would lack a clear idea of what their rights would be if the debtor went broke.

*Lapiana, supra*, 909 F.2d at 223–224. The Court of Appeals went on to hold that the elements of estoppel against the government had not been shown and that the Court would not create "a new defense of uncertain boundaries and dubious compatibility with the rules on estopping the government." *Id.* at 225.

There are other good reasons supporting the notion that the bankruptcy court should allow interest at the rate set forth in a state's legislative scheme absent a compelling interest to the contrary. First, adoption of a "market rate" approach would leave "an unresolved fact issue in every bankruptcy case, which would require litigation for every new day's market." *Galveston Indep. School Dist. v. Heartland Fed. Sav. & Loan Assoc.,*

*supra*, 159 B.R. at 204. Secondly, a legislative tax scheme designed to raise revenue to pay the costs of government is unlike a commercial transaction, where the parties have bargained for their rights, since "title insurance, hazard insurance, and other lender protections, which are included in standard mortgage agreements, are lacking. . . ." *In re Liuzzo, supra*, 204 B.R. at 240. The Court agrees, for the reasons set forth in *Liuzzo*, that involuntary creditors are in some ways worse off than voluntary creditors who can bargain for other protections and accordingly extend a lower rate of interest.

▮ For these reasons, Court aligns itself with the latter line of cases, and believes that it possesses the power to modify rights created by state law or private agreement. Indeed, the Bankruptcy Code itself contains many provisions which specifically modify or abrogate such rights. *See, e.g.*, 11 U.S.C. §§ 362, 522(f), 543, 547. The Code is also replete with instances in which Congress has made such a power explicit. *See, e.g.*, 11 U.S.C. §§ 363(*l*), 365(e)(1), 545, 1123(b), 1322(b). However, where that power is *not* explicit—where it resides only in general language directing the Court to allow interest on an oversecured claim—the Court should be loathe to exercise it in the absence of compelling evidence that recognition of a right created by state statute or private agreement would do violence to the principles which constitute the foundation of bankruptcy law. Case law offers four examples of such situations: where there has been misconduct by the creditor, where application of the statutory interest rate would cause direct harm to the unsecured creditors, where the statutory interest rate is a penalty, or where its application would prevent the Debtor's fresh start. For the following reasons, none are applicable here.

*Scenarios 1 (A Showing of Misconduct) & 2 (Direct Harm):*

With respect to the first scenario, the Debtor in this case has not presented any evidence of affirmative misconduct by the City. *See In re Lapiana, supra*. In the absence of such a showing, the Court declines to find any misconduct by the City.

With respect to the second scenario, the Debtor relies heavily upon *In re Wasserman*, 151 B.R. 4, 5 (D.Mass.1993), which held that a state statutory rate of interest failed to "provide the right balance between the interests of the creditors and the debtors," and therefore allowed interest at the federal judgment rate. The *Wasserman* court's primary concern was fairness to the unsecured creditors, as is evident by the following passage:

> In the present case, in addition to the City of Cambridge, there are unsecured creditors who have claims on the Debtors' assets. The Debtors' bankruptcy plan establishes a junior trust out of which these unsecured creditors are to obtain repayment. The unsecured creditors, however, draw on this trust only after the estate has paid off its more senior claims, including administrative costs and tax claims. According to the Debtors, the estate is already unable to satisfy all its administrative claims. Thus, there is a high likelihood, as in all bankruptcies, that the unsecured creditors will not be repaid in full. The extent of their losses, then, will depend on whether priority claims, like the tax claim, are entitled to the statutory rate of post-petition interest or the federal judgment rate in this case. . . . Granting the City the statutory rate, which is approximately twice the federal judgment rate, will cause the unsecured creditors a direct harm by diminishing the value of the estate from which they hope to draw. Consequently, it would be inequitable to the unsecured creditors to impose the higher, statutory rate.

*Wasserman*, 151 B.R. at 5 (citations omitted). In the present case, there are no unsecured creditors entitled to a distribution in this case. Accordingly, the Court need not address the concerns raised by the *Wasserman* court.

*Scenario 3 (Whether the Statutory Rate is a Penalty):*

▮ The Debtor argues that a portion of the interest charged by the City constitutes a penalty, despite the fact that the Administrative Code does not label it as such. A penal-

ty is that portion of a tax obligation which is punitive, not compensatory, in nature. *See In re Hovan, Inc.*, 96 F.3d 1254, 1259 (9th Cir.1996). The purpose of interest is to compensate for the loss of monetary value, while a penalty is typically charged for a failure to act by a certain deadline. *Id.* A penalty is typically a one-time charge added to unpaid principle, whereas interest generally continues to accrue until the underlying debt is satisfied. *In re Navis Realty, Inc., supra.*

The Debtor argues that the City has, in effect, conceded that the interest is really a penalty, since the City has allegedly argued that it "attempts to have an extremely high interest rate so that debtor's [sic] will be discouraged from becoming indebted to the City, and will seek out other avenues for loans. The City is required to charge 6% over prime. However, the City's current charges are approximately 10% over prime. It is submitted that the City's rate is designed to act as a penalty and a preventative measure to dissuade entities from becoming indebted to the City." *See* Debtor's Mem., at 10.

The Court disagrees. First, the Court is not convinced that the City's position is as the Debtor so states or that the City's "concession" is so clear. To the contrary, the City argues in its brief that the "City's Statutory Rate is simply the cost of using the City's money and it is statutorily created to further the collection of real property taxes by the sovereign. The fact that the cost of using the City's money seems to be more expensive than using someone else's money does not make it a penalty." *See* Mem. of Law of the City of New York in Opposition to the Debtor's Motion for an Order Pursuant to Section 505 of the Bankruptcy Code, Determining the Debtor's Tax Liability to the City of New York and in Support of the City's Objection ("City's Mem."), at 12–13. Rather, by its argument, the City is merely pointing out that if a taxpayer does not wish to pay the statutory rate, it has several options, including securing a loan from a com-

mercial lender at a lower rate of interest so that it may timely pay its tax obligations. The City is not arguing, as the Debtor suggests, that the interest rate it employs is designed to punish a taxpayer who does not employ one of a variety of options.

Secondly, more probative of the City's purpose in charging the rate it charges is the Administrative Code itself, which specifically links the interest rate to be charged on unpaid taxes to prevailing market rates on commercial loans. Section 11–224 requires the banking commission to consider, in its calculation of the rate to be charged, the "prevailing interest rates charged for commercial loans extended to prime borrowers by commercial banks operating in the city" and ties the City's rate to those figures. This language is consistent with the notion that the City's motivation is to compensate itself for the time value of money, and not to punish recalcitrant taxpayers.

The Debtor also urges that "when Citibank is paying 4.65% on one-year certificates of deposit ... 18% compounded daily constitutes a penalty....." *See* Debtor's Mem., at 10. This argument is unpersuasive, as the Court does not believe that evidence [6] of the rate *paid* by a bank to a depositor is any evidence whatsoever of the rate *charged* by a bank for a loan. Simply stated, the Debtor's argument that the City's rate includes a punitive aspect is conclusory: the Debtor has not presented any evidence whatsoever, in the form of affidavits, legislative history or case law, to support its claim that a portion of the interest rate constitutes a penalty. *In re Liuzzo, supra*, 204 B.R. at 239 (concluding that Florida's tax rate of 18% was not a penalty).

The Court agrees with the City that simply because its rate is high does not make a portion of the rate a penalty. There are good reasons for taxing authorities to exact an interest rate when taxes go unpaid higher than that exacted by consensual mortgagees when lending money.[7]

---

**6.** Notwithstanding the Debtor's reference to a rate in its brief, there is no competent evidence in the record to establish that the rate is in fact as counsel argues it is.

**7.** *But cf. In re Kelton*, 137 B.R. 18 (Bankr. W.D.Tex.1992), wherein the Court stated:
There are no special equities raised by the fact that the interest claim asserted here happens

The interest rate paid to a mortgagee is only one variable in the equation constituting the mortgage transaction. Others exist: the length of time in which the note will be repaid; the loan-to-value ratio; the ability (or lack thereof) to adjust interest rates over the term of the loan to reflect changes in the economy; and the payment, at the inception of the loan, of a charge equal to one percent of the principal amount of the loan in addition to interest (the mortgage "points"). All are open to negotiation, and the assignment of a value to one variable during the bargaining process will invariably affect the values assigned to the others. Yet the taxing authority has control over nothing but the interest rate. The taxes may go unpaid for one year or ten, or the property may decline in value to become worth less than the taxes owed, and yet, the taxing authority has no ability to collect payment up front in the form of "points." While one may not agree with the result—who, indeed, likes or wants to pay taxes?—one must at least concede that there is a justification underlying a government's exaction of an interest rate higher than that imposed by a mortgagee.

Although an 18% rate is more typical of the rates charged by *unsecured* creditors, as opposed to secured creditors, the Court takes judicial notice of the fact that since the City is unable to bargain for lender protections such as title and hazard insurance, *In re Liuzzo, supra,* 204 B.R. at 240, the City may in fact be an unsecured creditor in some cases. The taxpayer may be uninsured and the property may burn to the ground, leaving the City with no security for repayment. In addition, some differential between tax rates and commercial rates is required, to encourage prompt tax payments. *In re DeMaggio, supra.*

Further, the Court also relies on the exhaustive analysis contained in *In re Navis*

*Realty, Inc.,* 193 B.R. 998 (Bankr.E.D.N.Y. 1996), which need not be repeated here. Upon scrutinizing the very statute at issue here, namely, § 11–224, the *Navis Realty* court held that no portion of the interest rate set forth therein represents a penalty.[8]

Lastly, the Court is not persuaded, on the present facts, by the cases cited by the Debtor for the proposition that interest under § 506(b) in this case should be limited to the federal judgment rate. The Debtor first cites *In re Laymon,* 117 B.R. 856 (Bankr. W.D.Tex.1990), *reversed,* 958 F.2d 72 (5th Cir.1992). *Laymon* involved the proper rate of postpetition interest to be paid to a *contractual* creditor. More importantly, although the Debtor concedes that *Laymon* was reversed by the Fifth Circuit, it contends that it was reversed on other grounds. *See* Debtor's Mem ., at 12. This Court disagrees, and believes that *Laymon* was reversed on the very grounds for which the Debtor cites it. *See In re Laymon,* 958 F.2d 72 (5th Cir.1992) (concluding that the contract, and not the federal judgment rate, provides the appropriate rate of postpetition interest). For the same reason, the Debtor's reliance upon *In re Kelton,* 137 B.R. 18 (Bkrtcy. W.D.Tex.1992), which based its determination upon the lower court's opinion in *Laymon,* is equally unavailing. *See* n. 7, *supra.*

*Scenario 4 (Prevention of the Debtor's Fresh Start):*

The Debtor also cites *Wasserman* for the proposition that imposition of the statutory rate would impede its fresh start. *In re Wasserman, supra,* 151 B.R. 4. Despite conceding that the Court will not be "called upon to restructure PGR's debt," it asserts that "PGR continues to exist as a viable entity[,] ... is not being dissolved, and providing a 'fresh start' for PGR should not be ignored." Debtor's Mem., at 10. However, it has been

---

to be held by a taxing authority. That the creditor is "involuntary" in the sense that no credit was intended to have been extended to this debtor does not change that creditor's position as a competing claimant for the estate's limited assets as part of the larger distribution scheme in bankruptcy.
*Kelton,* at 21. However, the *Kelton* court relied in large part on its own opinion in *In re Laymon,*

117 B.R. 856 (Bankr.W.D.Tex.1990), which was later reversed by the Fifth Circuit. *See In re Laymon,* 958 F.2d 72 (5th Cir.1992). The persuasiveness of *Kelton* has therefore been significantly diluted. *See also In re Navis Realty, supra.*

8. The *Navis Realty* court was not requested, however, to consider whether the compounding of the interest rate by the City constitutes a penalty. *See* discussion *infra* at 782.

the law for almost a century that, even where the bankruptcy law was silent and contained no such requirement, creditors are to be paid their full due, including post-petition interest under nonbankruptcy law, before any surplus may be returned to the Debtor. *See, e.g., Johnson v. Norris,* 190 F. 459 (5th Cir.1911). For this reason, if for no other, the Court cannot rationalize reducing the amount paid to the City to a sum below that to which the City is entitled under state law, only to have the remaining proceeds of the sale go to the Debtor. Such a scenario would be more akin to a "head start," not to a "fresh start."

### B. Compound Interest and Usury

▆▆▆ No section of the Bankruptcy Code deals directly with the compounding of interest on a secured tax claim, or with the method of computation permissible for interest awarded under Section 506(b). As a general rule, under New York law, compound interest is disfavored, *Rourke v. Fred H. Thomas Associates,* 616 N.Y.S.2d 160, 162 Misc.2d 41 (Sup.Ct.1994), and is not allowed in the absence of an express contract[9] *or statutory authority. In re Schuster's Will,* 3 N.Y.S.2d 702, 167 Misc. 194 (Sur.Ct.1938), *aff'd* 257 A.D. 55, 12 N.Y.S.2d 20 (1939), *aff'd* 284 N.Y. 569, 29 N.E.2d 392 (1940) (emphasis added). In this case, there exists statutory authority in the form of Section 11–123 of the Administrative Code. That section, entitled "Interest compounded daily" reads: "In computing the amount of any interest required to be paid under section 11–224 ... of the code, such interest shall be compounded daily."

The Debtor has not cited to any case in which a court has disallowed such interest under Section 506(b). Nevertheless, the Court's own research has revealed that prior to enactment of the Bankruptcy Code, interest upon interest was disallowed where the creditor's security was worth less than the debt *and* the estate in general was insufficient to pay all creditors in full. *See In re Marfin Ready Mix Corp.,* 220 B.R. 148 ((Bankr.E.D.N.Y.1998), at pages 159–64 and cases cited therein). Such is not the case

here, and those pre-Code cases are therefore distinguishable on both the law and the facts.

There are, however, several recent cases which *have* allowed interest upon interest. In *In re Manville Forest Products Corp.,* 60 B.R. 403 (S.D.N.Y.1986), a *solvent* chapter 11 debtor defaulted on principal and interest due on long-term loans. The question was whether the debtor must pay interest on past due interest, as well as on past due principal. The bankruptcy court held that the debtor need not pay such compound interest, and the district court reversed, stating that under the case of *Debentureholders Protective Committee of Continental Inv. Corp. v. Continental Inv. Corp.,* 679 F.2d 264 (1st Cir.), *cert. denied,* 459 U.S. 894, 103 S.Ct. 192, 74 L.Ed.2d 155 (1982) (the *"CIC* case"), interest on interest is available from a solvent debtor. Similarly, in *In re Greensboro Lumber Co.,* 183 B.R. 316 (Bankr.M.D.Ga.1995), the bankruptcy court concluded that the IRS was entitled to its statutory rate of interest under Section 506(b). Construing Section 6622 of the Internal Revenue Code which, in language very similar to Section 11–123, provides that interest shall be compounded daily, the *Greensboro Lumber* court held that daily compounding of interest was permissible, and allowed the IRS claim in an amount including such interest.

Finally, the Court does not believe, as the Debtor contends, that the 18% rate compounded daily is usurious under Section 190.40 of New York's Penal Code. The Debtor contends that Section 190.40 of the Penal Code makes it illegal to

> take or receive[ ] any money or other property as interest on the loan or forbearance of any money or other property, at a rate exceeding twenty-five per centrum per annum or the equivalent rate for a longer or shorter period.

Significantly, the Debtor omits from its quotation of the statute, critical language which defeats its argument: the statute actually states that a person is guilty of criminal

---

9. The Court notes that § 5–527 of New York's General Obligations Law, entitled "Enforceability of compound interest," condones the accrual of interest upon unpaid interest for "loans and other agreements." N.Y. Gen. Oblig. L. § 5–527 (McKinney's 1989 and Supp.1992).

usury in the second degree when, *not being authorized or permitted by law to do so,* he knowingly charges, takes or receives any money or other property as interest on the loan or forbearance of any money or other property, at a rate exceeding twenty-five per centrum per annum. . . .

Clearly, the City is authorized by law, *i.e.,* Sections 11–223 and 11–224 of the Administrative Code, to charge the rate that it charges. In addition, a crucial element of usury is a "loan or forbearance of money." *In re Foreclosure of Tax Liens by the City of Binghamton,* 521 N.Y.S.2d 140, 133 A.D.2d 988 (App.Div.1987). In that analogous case, the court held that a statutory penalty imposed upon water and sewer assessments was not a loan or forbearance of money within the meaning of New York's usury law. Lastly, common sense dictates that "a statute of general application, such as the . . . usury statute, will not generally render illegal another statute, such as the . . . scheme of interest and penalties on delinquent taxes." *Galveston Indep., School Dist. v. Heartland Fed. Sav. and Loan Assoc., supra,* 159 B.R. at 208 (construing Texas law).

For the reasons set forth at length above, the Court concludes that the Debtor has not set forth sufficient reason or evidence by which this Court should deviate from the allowance under Section 506(b) of interest at the rate, and method of computation, set forth under New York law.

### CONCLUSIONS OF LAW

1. The Court has jurisdiction over the subject matter and the parties to this core proceeding pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157(b)(2). Venue is proper. 28 U.S.C. § 1408.

2. With respect to taxes accruing prepetition, the Court hereby allows to the City, postpetition interest from the date of the filing to the effective date of the plan, at the rate set forth in the Administrative Code, compounded as set forth in that statute.

3. The Debtor's motion seeking to reduce the interest rate paid to the City is hereby denied.

By separate Order, the relief provided herein is entered on this day.