## In re ROUTE ONE WEST WINDSOR LIMITED PARTNERSHIP, Debtor.

**Bankruptcy No. 97–33423.**

United States Bankruptcy Court, D. New Jersey.

Sept. 4, 1998.

Robert S. Burrick, Scott A. Zuber, Pitney, Hardin, Kipp & Szuch, Florham Park, NJ, for Debtor.

Richard M. Meth, Deborah A. Reperowitz, Friedman, Siegelbaum L.L.P., Roseland, NJ, for Barclays Bank PLC.

Myron Waxberg, Cartaret, NJ, for Pathmark Stores, Inc.

### MEMORANDUM OPINION

STEPHEN A. STRIPP, Bankruptcy Judge.

This is the court's decision on confirmation of the debtor's plan of liquidation. A hearing was held on July 20, 1998, after which the court reserved decision. The principal issue is whether two secured creditors are entitled to interest at an increased contractual rate upon default resulting from failure to pay

such loans at their maturity dates. The court has jurisdiction pursuant to 28 U.S.C. §§ 1334(b), 151 and 157(a). This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (L) and (O). The following shall constitute the court's findings of fact and conclusions of law.

### I. FINDINGS OF FACT

The debtor is a New Jersey limited partnership. DKM Windsor Green ("DKM") is the sole general partner of the debtor and Morris Harris is the only limited partner. The debtor owned and operated a shopping center known as the Shops at Windsor Green, 3495 Route One South, Princeton, New Jersey ("the property"). On or about April 2, 1992 Pathmark Stores, Inc. ("Pathmark") made a construction loan to the debtor in the principal amount of $4,000,000.00, the primary purpose of which was to finance the construction of the shopping center on the property. The loan was reflected in a mortgage note from the debtor to Pathmark (the "Pathmark note"). The debtor executed a mortgage in favor of Pathmark on the property to secure the note (the "Pathmark mortgage").

On or about April 2, 1992 Barclays Bank PLC ("Barclays") also made a loan to the debtor in the principal amount of $16,500,-000.00 (the "Barclays loan"). The purpose of this loan was also to finance the construction of the shopping center. The debtor executed a mortgage note to Barclays evidencing the Barclays loan (the "Barclays note"). The maturity date on the Barclays note was April 7, 1997. The Barclays note provides that upon and following either the (i) maturity date or (ii) default by the debtor, the note shall bear interest at a rate per annum (the "default rate") of the lesser of: "(i) six (6) percentage points in excess of the Base Rate plus the applicable Base Rate Margin or (ii) the maximum rate permitted by law...." The default rate is 15½%. The pre-default base rate was 7.0625%. The post-default base rate is 9.5%.[1]

---

[1] The debtor alleges that the post-default base rate remained at 7.0625%. Barclays argues that the post-default base rate increased to 9.5%. The Barclays note provided that as long as the debtor was not in default, the debtor had the right to choose between two formulas for determining the interest rate. Barclays note, ¶ 2(B). Since the debtor defaulted by failure to pay the

The debtor executed a mortgage and security agreement to secure its obligations under the Barclays note. The mortgage encumbered the property. The security agreement provided additional security of, inter alia, the equipment, leases, rents, unearned premiums with respect to insurance policies, payments arising from operation of improvements on the property, services rendered, and payments from the voiding of transfers to the debtor.

On April 7, 1997, one day prior to the maturity date of the Barclays note, the debtor filed for relief under chapter 11 of title 11, United States Code (the "Bankruptcy Code"). At that time the debtor was current in payment of its obligations to Barclays and Pathmark. There were twelve non-insider unsecured creditors who were owed a total of $48,678.25 according to Schedule F filed with the bankruptcy petition. Barclays alleges, and the debtor does not dispute that, with one possible exception, these non-insider unsecured claims were not past due on the petition date. (Objection of Barclays Bank to Confirmation ¶ 18.) The debtor had cash on hand on that date of $330,423.24. *Id.* at ¶ 19. There was a contingent claim of the New Jersey Department of Transportation (NJDOT) for roadway improvements to be completed by March 23, 2002. (Third Modified Disclosure Statement, at 26.) The only other debt was an unsecured claim of the debtor's general partner DKM in the amount of $2,695,819.86. The debtor does not allege that any payment was due on DKM's claim as of the petition date. Thus, the debtor was substantially current on all of its obligations when the petition was filed. Barclays alleges, and the debtor does not dispute, that the purpose of the bankruptcy petition was to avoid paying interest to Barclays at the default rate. (Objection of Barclays Bank to Confirmation ¶ 12.) Indeed, the debtor admits that was its purpose. (Third Modified Disclosure Statement at 16–17.) The debtor had been negotiating a sale of the property to Federal Realty Investment Trust, and when that sale did not materialize the petition was filed. *Id.*

The court entered orders authorizing use of cash collateral under which the debtor made monthly adequate protection payments to Barclays and Pathmark of principal and interest at a pre-default rate. On November 3, 1997 the debtor filed a motion for an order authorizing private sale of substantially all of debtor's property free and clear of liens, with valid liens to attach to the proceeds of the sale pursuant to Code sections 363(b) and 363(f). On November 17, 1997 the court signed an order granting the sale motion. The sale order authorized the debtor to sell the property to National Re/Sources West Windsor LLC ("National") free and clear of liens, mortgages and encumbrances, for a purchase price of $ 19,200,000.00. The sale order provided that the secured lenders would retain a lien on the proceeds of the sale.

On December 19, 1997 the debtor closed the sale to National for an adjusted price of $19,000,000.00. On the closing date the debtor paid Barclays and Pathmark the principal due under the loans and interest at the non-default rate in amounts totaling $14,816,965.84 and $966,321.37, respectively.

Then on January 30, 1998 the debtor filed its First Modified Chapter 11 Plan of Liquidation and First Modified Disclosure Statement. Those instruments were subsequently modified. The court signed an order approving the Third Modified Disclosure Statement on June 5, 1998.

The Third Modified Plan of Liquidation ("plan") provides for payment in full of all unsecured claims with interest, with the exception of the unsecured claim of DKM, the debtor's general partner. The plan states that the debtor believes that both Barclays and Pathmark (the "secured creditors") have been paid in full by virtue of the payments made to them at the closing of the sale of the property. The plan also states that the secured creditors disagree with the debtor's position, and assert that in addition to the payments received at closing, they are entitled to be paid interest at the default rate for

note at maturity, it lost the right to make that election. The post-default base rate is therefore

the applicable base rate. *Id.* at ¶ 2(A).

the period following the maturity date until payment in full of their claims. As to the resolution of this dispute, the disclosure statement provides:

> The Court will determine whether Barclays and Pathmark are entitled to the payment of default/post-maturity interest as provided for pursuant to their loan documents at the hearing on confirmation of the Debtor's Third Modified Plan of Orderly Liquidation. [Footnote omitted.] The Court will also determine the entitlement of Barclays and Pathmark to payment of late charges, costs and attorneys fees, which decision may be made at the confirmation Hearing or on some other date set by the Court. If the Court rules in favor of Barclays and Pathmark, and thus directs that it pay default/post-maturity interest or any other additional interest within fifteen (15) Business Days of the Effective Date, then the Debtor will either pay such amounts on or before that date or will appeal from the Court's decision and escrow funds in an amount sufficient to pay all sums ultimately determined to be due and payable to Barclays and Pathmark.

(Third Modified Disclosure Statement at 15–16.) The plan contains substantially identical provisions.

On July 20, 1998 the court held a hearing on the confirmation of the plan. Barclays voted to reject confirmation and Pathmark did not vote. The secured creditors both objected to confirmation to the extent that they do not receive interest at the default rate, interest on that interest, late fees and other costs. All parties filed certifications and memoranda in support of their positions. The court reserved decision on confirmation of the plan pending determination of the secured creditors' entitlement to interest at their respective default rates. Upon stipulation of the debtor and the secured creditors the court ordered that non-insider unsecured creditors be paid immediately.

The amount of Barclays' claim for additional interest at the default rate is $817,-544.24. Barclays also claims late charges of $40,877.21 and interest on default interest of $58,786.97. The amount of Pathmark's claim for interest at the default rate is $39,416.58 plus interest on that of $3,846.85. These claims, totaling $960,471.85, are the subject of this dispute.

As of June 30, 1998 the debtor held cash in the amount of $3,025,162. according to the Monthly Operating Report for June 1998. The debtor has since paid the non-insider unsecured creditors by order of August 4, 1998. The debtor must pay administrative expenses and establish an escrow or alternative security for NJDOT's contingent claim of $742,000. The plan proposes to pay DKM an initial installment of $1,845,847. on its unsecured claim of $2,695,819.86 if it prevails on this default interest dispute, with possible additional payments from collection actions and from the escrow for the NJDOT claim if the amount ultimately due to NJDOT is less than projected. (Third Modified Plan at 12–13.) Any distribution to the secured creditors on their claims for default interest will reduce the payment of DKM's claim to that extent.

## II. CONCLUSIONS OF LAW

The court begins by noting that in footnote 1, page 2 of the debtor's Memorandum of Law in Support of Confirmation of Debtor's Third Modified Plan of Reorganization filed on July 7, 1998, the debtor states:

> The Debtor's other secured creditor, Pathmark Stores, Inc. ("Pathmark") is in a substantially similar legal position to that of Barclays. The legal issues and arguments relative to Barclays' position are also applicable to Pathmark.

Pathmark has not disputed this statement. The Pathmark note and mortgage have not been included in the record, so the court concludes for purposes of this opinion that the parties stipulate that the relevant provisions of Pathmark's loan instruments are the same as Barclays'. As such, the court will treat the arguments of Pathmark and Barclays together as identical, except as noted otherwise, and will treat the debtor's contentions regarding Barclays as applying to both secured creditors.

## A. The Debtor Has Not Cured Its Default.

■ The debtor argues that its payment of principal and non-default interest to the secured creditors upon the sale of the property constitutes a "cure" of the default under Code section 1124(2) and therefore nullified the consequences of the default in accordance with Code section 1123(a)(5)(G). The debtor contends that as the default has been cured, the secured creditors are unimpaired under Code section 1124 and are deemed to have accepted the plan under Code section 1126(f). The debtor argues that as a result of the cure of the default, the secured creditors are not entitled to the post-default rate of interest in the loan agreements.

The secured creditors assert that the debtor's payment of principal and non-default interest cannot be considered a "cure" because the payment was made eight months after the maturity date of the notes. Barclays contends that "cure" means taking care of the event triggering default and returning to pre-default conditions. Barclays contends that in situations where a loan has matured by its own terms, there is no way to return to pre-default conditions and, therefore, no way to cure the default. Barclays concludes that the secured creditors are impaired under the terms of the plan.

The debtor asserts that case law addressing cure through a reorganization plan is applicable to cure via a sale prior to a plan under Code section 363(b). *In re 433 South Beverly Drive*, 117 B.R. 563 (Bankr.C.D.Ca. 1990), addressed this issue:

> Should a demand for post-default interest be treated any differently when made in the context of a plan as opposed to a sale under section 363? This court concludes that it should not.... The concept of "cure" is not exclusive to Chapter 11 or plans of reorganization. Cure is also an issue of consequence when a debtor seeks to assume an unexpired lease or executory contract under section 365. (footnote omitted) Both references to cure involve a determination of the amount of a creditor's claim which is allowable and ultimately payable in a bankruptcy proceeding, provided that assets prove to be sufficient....

Absent some compelling reason to the contrary, the construction of "cure" and its application to the allowed amount of a creditor's claim should not differ depending on whether it arises under a plan or in some other context in the Bankruptcy Code.

*Id.* at 566–67. *Accord Casa Blanca Project Lenders, L.P. v. City Commerce Bank (In re Casa Blanca Project Lenders, L.P.)*, 196 B.R. 140, 144 (9th Cir. BAP 1996). The court finds the above reasoning persuasive and holds that it is appropriate to consider case law addressing cure though a reorganization plan in determining issues regarding cure through a section 363 sale.

The debtor relies on Ninth Circuit cases for the proposition that it may cure and reinstate the secured creditors' loans that matured by their own terms without paying interest at the default rate. Although there are many cases on the enforceability of default interest rates, few cases address the specific question of whether a debtor may cure a default by virtue of failure to pay upon maturation by paying principal and interest at a non-default rate. In *Great Western Bank & Trust v. Entz–White Lumber and Supply, Inc. (In re Entz–White Lumber & Supply, Inc.)*, 850 F.2d 1338 (9th Cir.1988), the Ninth Circuit addressed that issue. In *Entz–White* the debtor's loan had matured by its own terms. *Id.* at 1339. The debtor sought to cure the default by paying the full amount due to the creditor on confirmation of the plan. *Id.* The creditor argued that the cure provision of Code section 1124(2) only applied to defaults resulting from acceleration. *Id.* at 1340. The creditor asserted that as the loan had matured by its own terms, payment of interest at the higher default rate was not a "consequence" of default that could be nullified. *Id.* The Ninth Circuit rejected this argument because section 1123(a)(5)(G) provides for the cure of "any" default not just defaults resulting from acceleration. *Id.* at 1341. The Ninth Circuit stated that "[i]t is clear that the power to cure under the Bankruptcy Code authorizes a plan to nullify all consequences of default, including avoidance of default penalties such as higher interest." *Id.* at 1342. *Accord In*

re Johnson, 184 B.R. 570, 574–75 (Bankr. D.Minn.1995).

The Ninth Circuit also rejected the creditor's argument that it was entitled to interest at the default rate under Code section 506(b). The court stated:

> To have done so [allowed interest at the default rate] would have completely eliminated the benefits of the cure in this case.... The more natural reading of sections 506 and 1124 is that the interest awarded should be at the market rate or at the pre-default rate provided for in the contract.

Entz–White, 850 F.2d at 1343.

The Ninth Circuit then addressed this issue again in Florida Partners Corp v. Southeast Co. (In re Southeast Co.), 868 F.2d 335 (9th Cir.1989). The debtor in Southeast was in default on its loan and the loan agreement required the debtor to pay interest at a default rate as a result of the default. Id. at 336. The creditor argued that "because Southeast's duty to pay the post-default interest rate is not a consequence of acceleration, that duty cannot be eliminated by a section 1124(2) cure." Id. at 337. Following the Entz–White decision the Ninth Circuit stated:

> The consequences of default for purposes of cure are not limited to acceleration. Section 1124(2) of the Bankruptcy Code "authorizes a plan to nullify all consequences of default, including avoidance of default penalties such as higher interest." Plans to cure defaults under section 1124(2) are not limited to those defaults resulting in acceleration. Nor are such plans limited to nullifying only the acceleration component of a default.

Id. at 338 (citations omitted).

The debtor also offers Casa Blanca as support for its argument. The debtor in Casa Blanca defaulted on its loan payments, however; the loan did not mature by its own terms. Casa Blanca, 196 B.R. at 141. Additionally, the Casa Blanca court only addressed whether the creditor was entitled to interest at the default rate under section 506(b). Id. at 142–47. As such, Casa Blanca is inapplicable to the instant question of whether the debtor could cure a loan which had matured by its own terms under section 1123, and thereby render a creditor unimpaired under section 1124(2).

The secured creditors rely heavily on In re Liberty Warehouse Assoc. Ltd. Partnership, 220 B.R. 546 (Bankr.S.D.N.Y.1998), which, like Entz–White presents facts very similar to the instant case. One of the creditors in Liberty held a second mortgage on the debtor's property that had matured by its own terms. Id. at 547. The terms of the loan provided for an increase in interest rate upon maturation from 14% to 22.8%. Id. The debtor proposed to pay the creditor the principal owed and interest at the non-default rate. Id. The debtor argued that payment of principal and non-default interest cured its default and thereby avoided the accrual of interest at the default rate. Id. The creditor objected, arguing that the debtor's plan did not effect a cure under section 1124 because the loan had matured by its own terms and therefore the default could not be cured. Id.

The Liberty court found that pursuant to sections 1124(2) and 506(b), the debtor had to pay the creditor interest at the default rate. Id. at 547. The Liberty court reviewed the decision in Entz–White, noting that the Entz–White court found payment of principal and non-default interest on a naturally matured loan to nullify the consequences of default. Id. at 548–49. The Liberty court rejected the Entz–White reasoning:

> Debtor cannot "cure" the default of the Associates' Loan pursuant to § 1124(2) because the loan matured pre-petition. Id.; see also United States Trust Co. of New York v. LTV Steel Co. (In re Chateaugay ), 150 B.R. 529, 543 (Bankr.S.D.N.Y.1993) ("[A]ny 'reinstatement' under section 1124(2) can do no more than reinstate an obligation's original maturity date. Although the passing of the alleged maturity date of the [bonds] during the pendency of one of the longest and most complex bankruptcy proceedings ever filed is somewhat of a fortuitous event, section 1124(2) only allows the Debtors to return the accelerated claim to the original maturity date"), aff'd, 170 B.R. 551 (S.D.N.Y.1994); see

*generally* JAMES F. QUEENAN, JR., CHAPTER 11 THEORY AND PRACTICE: A GUIDE TO REORGANIZATION § 30.15 at 30:49 (1994) (concluding that *Entz–White* is in error, and that section 1124(2) was intended to "cure" only defaults resulting from acceleration clauses).

*Id.* at 550.

For the reasons stated below, the court holds that payment of principal and non-default interest to an oversecured creditor on a loan which provides for payment of a default rate of interest upon maturation and which has, in fact, matured does not constitute a cure which results in unimpairment of the creditor.

Section 1123(a)(5)(G) states:

(a) Notwithstanding any otherwise applicable nonbankruptcy law, a plan shall—

(5)provide adequate means for the plan's implementation, such as—

(G) curing or waiving of any default.

11 U.S.C. § 1123(a)(5)(G). Section 1124(2) then sets forth the elements of unimpairment through default cure. Under section 1124 a class of claims is impaired unless the plan:

(2) notwithstanding any contractual provision or applicable law that entitles the holder of such claim or interest to demand or receive accelerated payment of such claim or interest after the occurrence of a default—

(A) cures any such default that occurred before or after the commencement of the case under this title, other than a default of a kind specified in section 365(b)(2) of this title;

(B) reinstates the maturity of such claim or interest as such maturity existed before such default;

(C) compensates the holder of such claim or interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law; and

(D) does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest.

11 U.S.C. § 1124. As section 1124(2) is written in the conjunctive, all four of its requirements must be met for a creditor to be deemed unimpaired. 11 U.S.C. § 1124(2); *In re Ace–Texas Inc.,* 217 B.R. 719, 726 (Bankr.D.Del.1998). Unimpaired creditors are "conclusively presumed to have accepted the plan, and solicitation of acceptances ... is not required." 11 U.S.C. § 1126(f).

 It is the language of the opening clause of section 1124(2) and that of section 1124(2)(B) which is at issue here. Where the plain language of a statute is clear, the court does not look beyond it unless "literal application would lead either to an absurd or futile result or one plainly at odds with the policy of the whole legislation." *Dutton v. Wolpoff & Abramson,* 5 F.3d 649, 654 (3d Cir.1993). The opening clause of section 1124(2) states that the subsection is applicable "notwithstanding any contractual provision or applicable law that entitles the holder of such claim or interest to demand or receive *accelerated* payment of such claim or interest after the occurrence of a default." 11 U.S.C. § 1124(2) (emphasis added). Webster's New Collegiate Dictionary defines "accelerate" as follows: "1: to cause to bring about *at an earlier time;* 2: to cause *to move faster....* " (emphasis added). Black's Law Dictionary states that an "acceleration clause" is

a provision or clause in a mortgage, note, bond, deed of trust or other credit agreement, *which allows a lender the opportunity to call* monies due under the instrument. Such clause operates when there has been a default such as nonpayment of principal, interest, or failure to pay insurance premiums. (Citations omitted) (emphasis added).

The plain meaning of the term "accelerate" as used in an "acceleration clause" is that a lender has exercised its right under a loan agreement to call the loan entirely due and payable *before it otherwise would have been due but for the default.* Where a loan has become due because the end of its term has been reached, there has been no "acceleration."

Moreover, section 1124(2)(B) states that the cure must reinstate "the maturity of such

claim or interest as such maturity existed *before such default* " (emphasis added). The provision clearly refers to a maturity date that was accelerated due to a default. As noted by both the *Entz–White* and *Liberty* courts, the concept of curing a default under the Code "means taking care of the triggering event and returning to pre-default conditions. The consequences are thus nullified." *DiPierro v. Taddeo (In re Taddeo* ), 685 F.2d 24, 26–27 (2d Cir.1982). *See Liberty,* 220 B.R. at 548 and *Entz–White,* 850 F.2d at 1340. In the instant case, the loan matured and the debtor failed to pay the full amount due upon maturity. Thus the default occurred *after* maturity not before as required for reinstatement by Code section 1124(2). Logically, the maturity of a loan which occurred because of the arrival of the date upon which the loan was ultimately due cannot be reinstated because the court cannot turn back the pages of the calendar. There is no way to change the event which triggered maturation. A post-maturity date "reinstatement" is therefore in reality an involuntary extension of the loan term and of the agreed maturity date. This does not put the lender in the same position it would have been in if there had been no default, which is the purpose of Code section 1124(2). The interpretation of Code section 1124(2) employed in *Entz–White* distorts the plain meaning of that section.

The court in *In re Ace–Texas Inc.,* 217 B.R. 719 (Bankr.D.Del.1998), relied on by the *Liberty* court reached the same conclusion:

> The plain language of Code § 1124(2) unimpairs claims based on debt that was accelerated upon default, as long as the debtor satisfies the four conditions (A) through (D). [The creditors] never accelerated the Notes. Rather, the Notes matured according to their own terms. Even if I were to ignore the obvious language about acceleration, the four conditions—each of which must be satisfied, for they are joined by the conjunction "and"—are directed toward accelerated, not matured debt. To take just one example, it makes no sense to reinstate the maturity of a claim that has already matured. There-

fore, Code § 1124(2) cannot serve to unimpair [the creditor's] claims.

217 B.R. at 726.

The court's finding that a debtor cannot cure a default in the form of failure to pay upon maturation finds support in several law review articles. In *The Impact of Cure and Reinstatement on Default Interest,* the authors stated:

> Under the plain meaning of § 1124(2), a cure can be effected only by curing any default and reinstating the maturity of such claim or interest as such maturity existed before default. Because any "reinstatement" under § 1124(2) can do no more than reinstate the obligation's original maturity, it was illogical for the courts to hold that a fully matured debt can have its original maturity "reinstated." (footnote omitted) It is also important to recognize that § 1124(2) uses the connector "and," not "or," which requires both cure of default and reinstatement of maturity, which is not possible with a fully matured debt. Thus, the fact that a mature debt cannot have its "maturity reinstated" precludes § 1124(2) from applying as a matter of law.

Grant T. Stein & Ralph S. Wheatly, *The Impact of Cure and Reinstatement on Default Interest,* 16 Am. Bankr.Inst. J. 1, 8 (Aug. 1998). Further, JAMES F. QUEENAN, JR., CHAPTER 11 THEORY & PRACTICE § 30.15, at 30:49 (1994) states:

> [*In re Entz–White Lumber & Supply, Inc.*] appears to be in error. Section 1124(2) applies only to the curing of defaults that have accelerated the debt. There was no issue of cure before the court in *Entz–White.* The entire debt was due without acceleration. The impairment rule applicable to unaccelerated debt should therefore apply. Under that rule, impairment can be avoided only if the plan proposes cash payment in the full amount of the claim in accordance with the parties' agreement. When the agreement requires a higher post-default rate of interest, this means the higher rate must be paid. Any other treatment would alter the creditor's rights.

*Ace–Texas*, 217 B.R. at 727 (quoting JAMES F. QUEENAN, JR., CHAPTER 11 THEORY & PRACTICE § 30.15, at 30:49 (1994)).

As acknowledged in *Entz–White*, "[a]bsent a clearly expressed legislative intention to the contrary, [the language of the statute] must ordinarily be regarded as conclusive." 850 F.2d at 1341 (quoting *American Tobacco Co. v. Patterson*, 456 U.S. 63, 68, 102 S.Ct. 1534, 71 L.Ed.2d 748 (1982)). The *Entz–White* court stated that the legislative history suggests that default by acceleration was only one type of default encompassed by section 1124 and that the language of section 1124 was broad enough to apply to defaults by failure to pay upon maturation. *Entz–White*, 850 F.2d at 1341. The court finds this conclusion to be erroneous. The Senate Report on section 1124 states "that 'a claim or interest is unimpaired by curing the effect of a default and reinstating the original terms of an obligation *when maturity was brought on or accelerated by the default.*' " *Id.* (quoting S.Rep. No. 95–989, 95th Cong., 2d Sess. 120 (1978), U.S.C.C.A.N.1978, pp. 5787, 5906) (emphasis added). The Senate Report clearly states that section 1124 was intended to apply to situations where maturity was precipitated by a default, not default by failure to pay upon the natural maturation of a loan. *Entz–White* simply dismisses the legislative history as not dispositive. *Id.*

As noted in *In re Ace–Texas:*

The legislative history refers to maturity after a default, whether termed an acceleration or not. It actually supports a finding that there was no cure available for [the creditor's] claims, because [the debtor's] defaults occurred after maturity; maturity was not triggered by default....

217 B.R. at 727. The conclusion that section 1124(2) was not intended to apply to defaults which occurred after maturity is further supported by another law review article, *The Right of Oversecured Creditors to Default Rates of Interest From a Debtor in Bankruptcy*, which concludes:

An accurate reading of the Bankruptcy Code, however, shows that the Code does not defeat an oversecured creditor's right to post-petition default rate interest. The better reasoned cases recognize that ov-

ersecured creditors are fully entitled to receive the benefit of their bargain, including postpetition interest at the contract rate. In enacting the Bankruptcy Code, Congress clearly did not intend to defeat an oversecured creditor's right to postpetition default rate interest.

Craig H. Averch et al., *The Right of Oversecured Creditors to Default Rates of Interest From a Debtor* 47 Bus. Law. 961, 990 (May 1992).

As a result of the foregoing the court concludes that the debtor did not effect a "cure" by paying the secured creditors principal and interest at the non-default rate months after the loans reached their maturity. Because the debtor cannot comply with section 1124(2), the only alternative to render the lenders unimpaired would be to comply with section 1124(1). That section states:

Except as provided in section 1123(a)(4) of this title, a class of claims or interests is impaired under a plan unless, with respect to each claim or interest of such class, the plan—

(1) leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest; ...

11 U.S.C. § 1124(1). Therefore, section 1124(1) would require payment of interest at the default rate for the secured creditors to be deemed unimpaired. The debtor does not argue that section 1124(1) is applicable.

**B. The Secured Creditors are Entitled to Interest at the Default Rate Under Section 506(b).**

*1. The Rate of Interest Allowed Under Section 506(b) is Determined by Federal Law.*

██ Section 506(b) states:

To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose.

11 U.S.C. § 506(b). The debtor does not dispute that section 506(b) entitles the secured creditors to recover post-petition interest. The dispute is over the rate. Section 506(b) does not address this issue.

The allowance of interest on claims in bankruptcy has long been determined by federal law. *Vanston Bondholders Protective Committee v. Green*, 329 U.S. 156, 162–63, 67 S.Ct. 237, 91 L.Ed. 162 (1947). The touchstone of such decisions "has been a balance of equities between creditor and creditor or between creditors and the debtor." *Id.* at 165, 67 S.Ct. 237. The continuing validity of these principles under the Code was acknowledged in *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 248, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989).

*2. There is a Presumption In Favor of Granting Interest at the Contract Rate.*

■ The Supreme Court "has been reluctant to accept arguments that would interpret the Code, however vague the particular language under consideration might be, to effect a major change in pre-Code practice that is not the subject of at least some discussion in the legislative history." *Dewsnup v. Timm*, 502 U.S. 410, 419, 112 S.Ct. 773, 116 L.Ed.2d 903 (1992). The legislative history of section 506(b) does not refer to an applicable rate of interest. *In re Laymon*, 958 F.2d 72, 74 (5th Cir.1992) (citing 3 COLLIER ON BANKRUPTCY ¶ 506.05, at 506–47). As such the court concludes that Congress did not intend for section 506(b) to change pre-Code practice concerning the rate of interest applied under that section. *Id.* (citing *Pennsylvania Department of Public Welfare v. Davenport*, 495 U.S. 552, 110 S.Ct. 2126, 109 L.Ed.2d 588 (1990) ("We will not read the Bankruptcy Code to erode past bankruptcy practice absent a clear indication that Congress intended such a departure.")).

*In re Laymon* summarized the pre-Code practice regarding payment of interest to oversecured creditors:

Prior to the enactment of the Code, the majority of courts utilized the contract rate of interest when allowing an oversecured creditor to collect post-petition interest pursuant to § 506(b). 3 COLLIER ON BANKRUPTCY ¶ 506.05, at 506–46. Un-

der pre-Code law, courts were "not required in all cases to apply a contractual default rate of interest in determining the amount of an 'allowed secured claim' within the meaning of [§ 506(b) ]." *In re W.S. Sheppley & Co.*, 62 B.R. 271 (Bankr. N.D.Iowa 1986) (discussing the following pre-Code cases: *Vanston Bondholders Protective Committee v. Green*, 329 U.S. 156, 67 S.Ct. 237, 91 L.Ed. 162 (1946); *American Surety Co. v. Sampsell*, 327 U.S. 269, 66 S.Ct. 571, 90 L.Ed. 663 (1946); *U.S. Trust Co., v. Zelle*, 191 F.2d 822 (8th Cir.1951), *cert. denied*, 342 U.S. 944, 72 S.Ct. 558, 96 L.Ed. 703 (1952); *In re Black Ranches, Inc.*, 362 F.2d 8 (8th Cir.), *cert. denied sub nom., Black v. Strand*, 385 U.S. 990, 87 S.Ct. 595, 17 L.Ed.2d 450 (1966); *Ruskin v. Griffiths*, 269 F.2d 827 (2d Cir. 1959), *cert. denied*, 361 U.S. 947, 80 S.Ct. 402, 4 L.Ed.2d 381 (1960)). Most courts took a flexible approach, recognizing situations in which "the higher rate would produce an inequitable or unconscionable result, so as to require disallowance thereof." *Sheppley*, 62 B.R. at 277.

958 F.2d at 75. As a result, many courts have held that absent equitable considerations that demand a different result, there is a presumption that the contract rate is the applicable rate under section 506(b):

....in the absence of equitable considerations that would compel a different result, the prevailing contract rate of the underlying document should control. Indeed, with respect to consensual lien creditors the majority view has long been that the contracted for rate applies under section 506(b). WEINTRAUB & RESNICK, BANKRUPTCY LAW MANUAL, ¶ 5.11[4], n. 33 (1992).

*Princeton Overlook Joint Venture v. Maxwell Zaitz (In re Princeton Overlook Joint Venture )*, 1993 WL 280456 (Bankr.D.N.J.). *See also In re Terry Ltd. Partnership*, 27 F.3d 241, 243 (7th Cir.1994) ("[w]hat emerges from the post-*Ron Pair* decisions is a presumption in favor of the contract rate subject to rebuttal based upon equitable considerations"); *In re Laymon*, 958 F.2d at 75 ("we hold that when an oversecured creditor's claim arises from a contract, the contract provides the rate of post-petition interest");

*In re Ace–Texas, Inc.,* 217 B.R. at 723; *In re Johnson,* 184 B.R. at 573 ("bankruptcy courts recognize a presumption in favor of the parties [sic] agreed interest rate subject to rebuttal based upon equitable considerations"); *Fischer Enterprises, Inc. v. Geremia (In re Kalian ),* 178 B.R. 308, 312–13 (Bankr.D.R.I. 1995) ("when ... determining the appropriate post-petition interest rate applied to consensual, oversecured claims including those arising from agreements with default interest provisions, bankruptcy courts give deference to the parties' agreed interest term, but may modify the rate in appropriate circumstances"); *In re Consolidated Properties Ltd. Partnership,* 152 B.R. 452, 454 (Bankr. D.Md.1993) ("a base contractual rate of interest should be used for purposes of awarding interest to an oversecured creditor under § 506(b), assuming there are no extreme countervailing factors present such as illegality or unconscionable self-dealing"); *In re Courtland Estates Corp.,* 144 B.R. 5, 9 (Bankr.D.Mass.1992) (permitting calculation of interest under section 506(b) at contract rate).

The effect of the rebuttable presumption in favor of the contract rate is to impose upon the debtor the burden of proving that the equities favor allowing interest at a different rate. *In re Ace–Texas, Inc.,* 217 B.R. at 723.

**3. State Law is Relevant to Allowance of Default Interest Rates in Bankruptcy.**

 The fact that federal law determines the interest rate to be allowed on an oversecured claim under Code section 506(b) does not make state law irrelevant. The balancing of equities used to determine post-petition interest rates in bankruptcy is based on the proposition that fairness to other parties may require that an oversecured creditor receive a lesser rate than it would receive absent bankruptcy. It will rarely, if ever, be the case, however, that an oversecured creditor will receive a greater interest rate in bankruptcy than it would otherwise receive. State law is therefore relevant to determine the interest rate allowed outside of bankruptcy. If the requested rate is not allowed under applicable state law, it should not be allowed in bankruptcy, or the secured creditor would receive a windfall. *See In re W.S.*

*Sheppley & Co.,* 62 B.R. 271, 278 (Bankr. N.D.Iowa 1986) ("appropriate regard" should be given to state law); *In re Consolidated Properties Limited Partnership,* 152 B.R. 452, 456 (Bankr.D.Md.1993) (state law is a "relevant initial inquiry").

**a. New York Law Governs the Issue of Whether the Default Rate is Allowed Under State Law.**

 In this case the parties dispute which state's law applies. The loan agreement between the debtor and Barclays states that New York law governs. The debtor asserts, however, that New Jersey law is applicable. The debtor contends that application of New York law would be contrary to New Jersey's fundamental policy of protecting borrowers from imposition of default rates of interest that are merely penalties. The debtor concludes that New Jersey has a materially greater interest in determining the instant issues because this case involves a New Jersey debtor and New Jersey property. Finally, the debtor claims that, even if New York law applies, the default interest rate is still unenforceable as default interest rates which are penalties are unenforceable in New York as well as in New Jersey.

The secured creditors argue that New York law is applicable. Barclays notes that its loan documents state that said documents would be governed by and construed under the laws of the State of New York. Barclays maintains that it is a well-established general rule that the laws of the state chosen by the parties will be applied to determine their rights and duties under an agreement. Barclays asserts that this rule applies unless the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the choice or application of the chosen law would be contrary to a fundamental policy of a state which has a materially greater interest. Barclays contends that New York has a substantial relationship to the parties and the transaction, as the debtor willingly entered into a loan agreement with Barclays which is located in New York and has no New Jersey offices. Barclays also avers that application of New York law is not contrary to any

fundamental policy of New Jersey. Barclays maintains that, like New York law, under New Jersey law default rates are enforceable unless they are a penalty.

■ Barclays has correctly stated the test to determine the applicable state law. Under New Jersey law, when parties to a contract have agreed to be governed by the law of a particular state, that choice will generally be upheld. *Stanton v. Rich Baker Berman & Co., P.A.*, 876 F.Supp. 1373, 1381 (D.N.J.1995) (citing cases); *Instructional Systems, Inc. v. Computer Curriculum Corp.* 130 N.J. 324, 341, 614 A.2d 124 (1992). However, under New Jersey law a choice of law provision in a contract will not be honored if the chosen state has no substantial relationship to the transaction or parties or application of the chosen law would conflict with a fundamental public policy of a state having a greater interest in the determination of the issue. *Stanton*, 876 F.Supp. at 1381; *Instructional Systems*, 130 N.J. at 342, 614 A.2d at 133. New York law is therefore applicable unless one of the stated exceptions applies.

New York clearly has a substantial relationship to the transaction or parties. As Barclays points out, it has done no lending in New Jersey since 1991 and a vice president of Barclays testified that he is not aware of any open Barclays loan in New Jersey with the exception of the loan to the debtor. Barclays points out that its main offices are in New York, it regularly transacts business in New York, and the debtor closed its loan from Barclays in New York. As such, New York has a substantial relationship to the parties and the transaction.

Insofar as the respective public policies of New York and New Jersey are concerned, under New Jersey law default interest rates that are penalties are unenforceable. *Metlife Capital Financial Corp v. Washington Avenue Assoc.*, 313 N.J.Super. 525, 713 A.2d 527, 527, 533, 536–37, 1998 N.J. Super LEXIS 293 *1, *19, *31–*32. Similarly, as noted by the debtor, default rates that amount to penalties are equally unenforceable under New York law. *Emery v. Fishmarket Inn of Granite Springs, Inc.*, 173 A.D.2d 765, 766, 570 N.Y.S.2d 821, 823 (2 Dept.1991) ("so long as an interest rate is not usurious or does not constitute a penalty, the parties are similarly free to agree that the contract rate of interest shall increase upon default"); *Union Estates Co. v. Adlon Constr. Co.*, 221 N.Y. 183, 186, 116 N.E. 984, 985 (1917) (agreement to increase interest rate upon maturity is not a penalty and is enforceable as long as not usurious). *See also In re Trans World Airlines, Inc.*, 145 F.3d 124, 134 (3d Cir.1998) ("the public policies of New York are 'firmly set against the imposition of penalties or forfeitures for which there is no statutory authority' "). It is undoubtedly true, however, that the states differ in their definition of what constitutes an unenforceable penalty, because there is no question that default interest is generally permitted under New York law and is difficult to obtain under New Jersey law.[2] It is therefore arguable that allowance of a default rate of interest without the proofs required by *Metlife Capital Financial Corp.* conflicts with a fundamental policy of New Jersey. The court does not have to determine that issue, however, because the debtor has not established the other part of the subject exception, namely that New Jersey has a greater interest in the determination of the issue of default rates than New York has in this case. The debtor has offered no proofs on this point, and New

---

2. Under New Jersey law default interest rates are only enforceable if they are valid liquidated damages. *Metlife Capital*, 713 A.2d at 536–37, 1998 N.J. Super LEXIS 293 at *19, *31–*32. Under New Jersey law a liquidated damages provision is only valid if 1) the amount fixed is related to the actual damage that is likely to be suffered, and 2) the amount of damage caused by the breach is of the type which is incapable or very difficult to actually estimate. *Id.* at 533 *18. The debtor points to *Pyramid Centres & Co. Ltd. v. Kinney Shoe Corp.*, 244 A.D.2d 625, 663 N.Y.S.2d 711, 713 (1997) for the proposition that

New York courts also use a liquidated damages analysis in determining whether an interest rate is a penalty. *Pyramid Centres*, however, does not stand for that proposition. *Pyramid Centres* simply addresses the enforceability of liquidated damages clauses and does not discuss default interest rates. The court has found no case in which a New York court used a liquidated damages test when determining whether a default interest rate is a penalty. Moreover, such a test is plainly inconsistent with *Union Estates, supra,* and *Ruskin v. Griffiths, infra.*

York certainly has as great an interest as New Jersey in the outcome since the debtor saw fit to come to New York and borrow millions of dollars from a New York bank. The court therefore concludes that the debtor has not proven the presence here of an exception to the general rule that a contractual choice of law provision will be upheld. New York law applies.

*b. The 15.125% Interest Rate is Not an Unenforceable Penalty Under New York Law.*

■■■■■ "[C]ontractual provisions providing for an increased interest rate on default are enforceable under New York law." *In re Chateaugay*, 150 B.R. 529, 542 (Bankr. S.D.N.Y.1993). *See also Ruskin v. Griffiths*, 269 F.2d 827, 832 (2d Cir.1959) ("[a] variable interest provision in event of a stated default such as we have here is not a penalty, nor should it be considered unconscionable"); *Emery*, 173 A.D.2d at 766, 570 N.Y.S.2d at 823 ("so long as an interest rate is not usurious or does not constitute a penalty, the parties are similarly free to agree that the contract rate of interest shall increase upon default"); *Union Estates Co.*, 221 N.Y. at 187, 116 N.E. at 985 ("an agreement to pay interest upon a loan from its date until its payment at a rate before and a differing rate after its maturity is an agreement to pay interest and not a penalty as to the latter rate."). New York courts have held that default interest rates are not penalties because they are compensation for the increased cost of collection. *Citibank, N.A. v. Nyland (CF8) Ltd.*, 878 F.2d 620, 625 (2d Cir.1989) (stating that the increased interest rate reflects the increased risk of non-collection); *In re Gas Reclamation, Inc. Securities Litigation*, 741 F.Supp. 1094, 1098 (S.D.N.Y. 1990) ("[u]nder New York law, an agreement to pay an increased interest rate on default is not a penalty, but compensation for the increased risk of non-collection"). The Second Circuit Court of Appeals explains:

> A variable interest provision in event of a stated default such as we have here is not a penalty, nor should it be considered unconscionable. It can be beneficial to a debtor in that it may enable him to obtain money at a lower rate of interest than he could otherwise obtain it, for if a creditor had to anticipate a possible loss in the value of the loan due to his debtor's bankruptcy or reorganization, he would need to exact a higher uniform interest rate for the full life of the loan. The debtor has the benefit of the lower rate until the crucial event occurs; he need not pay a higher rate throughout the life of the loan.

*Ruskin*, 269 F.2d at 832 (citations omitted). Similarly, the bankruptcy court in the Southern District of New York has stated:

> Parties use default interest rates as a means to compensate a lender for the administrative expenses and inconvenience in monitoring untimely payments. Because the costs incurred in performing this task will vary from case to case, the increased interest rate is a compromise by the lender and the borrower in recognition of the fact that attempting to quantify the exact dollar amount of the lender's injury would be impractical.

*In re Vest Associates*, 217 B.R. 696, 701 (Bankr.S.D.N.Y.1998).

The debtor argues that the default rate is an unenforceable penalty because there is sufficient equity in the property to protect the secured creditors. The Second Circuit specifically rejected this argument in *Citibank, N.A. v. Nyland (CF8) Ltd.*, when it stated "[t]he fact that the collateral in this case is sufficient does not negate Judge Knapp's observation that [the debtor's] default 'presented an increased risk that the collateral was in less-than-perfect health and that the mortgagee might have to resort to that collateral to obtain payment.'" 878 F.2d at 625. Therefore, the court rejects the debtor's contention.

According to the testimony of John P. McMahon, a vice president of Barclays, the default rates of interest charged by Barclays were not considered penalties. (McMahon Transcript ("Tr.") 42:2). Mr. McMahon testified that they are fixed at the discretion of each loan officer. (Tr. 41:8–9.) Mr. McMahon testified that the purpose of the default rate is to compensate the bank for the increased level of risk after a default has occurred. (Tr. 42:9–13.) Additionally, Barclays alleges that the default rate is imposed

to cover the increased costs of collection caused by a default. These reasons are in accordance with the reasons set forth above for enforcing default rates of interest.

New York courts have upheld default rates up to 25%. *Marine Management, Inc. v. Seco Mgmt., Inc.*, 176 A.D.2d 252, 574 N.Y.S.2d 207 (2 Dept.1991); *Emery*, 173 A.D.2d at 766–767, 570 N.Y.S.2d at 824 (upholding default rate of 25% as "highest rate permitted under law"). New York law sets 25% as the maximum non-usurious interest rate chargeable. McKinney's Penal Law § 190.40.

As a result of the foregoing, the court finds the 15.125% default rate is not considered a penalty under New York law and is therefore enforceable under that law.

*4. The Equities of the Case Do Not Rebut the Presumption in Favor of Granting Interest at the Default Rate.*

■■■ The court has thus far determined that the secured creditors' default rate is enforceable under New York law. As previously noted, there is a presumption that the federal courts will enforce the contract rate in bankruptcy, subject to rebuttal based upon the equities of the case. Therefore, unless the debtor has met its burden of proving the presence of such equities, the default rate applies. The stakes are high. As previously stated, if the secured creditors prevail they are entitled to additional interest of approximately $900,000.

One factor which the courts have considered is the difference between the non-default and default rates. Not surprisingly, courts have declined to enforce very high default rates. *See, e.g., In re Kalian*, 178 B.R. at 316–17 (refusing to enforce a default rate of 36%); *In re Consolidated Properties*, 152 B.R. at 458 (refusing to enforce interest rate which was 36% higher than base); *In re Hollstrom*, 133 B.R. at 539–40 (refusing to enforce default rate of 36% where pre-default rate was 12%); *DWS Investments, Inc.*, 121 B.R. 845, 850 (Bankr.C.D.Cal.1990) (refusing to enforce default rate of 25% where non-default rates were 14% and 15%); *In re White*, 88 B.R. 498, 511 (Bankr.D.Mass.1988) (default rate of interest of 48% was unenforceable where pre-default rate was 16.5%).

Courts have, however, permitted lower default interest rates. *In re Terry*, 27 F.3d at 244 (holding increase in pre-default rate of 14¼% to default rate of 17¼% was not unreasonable); *In re Liberty Warehouse*, 220 B.R. 546, 552 (enforcing 22.8% default rate where non-default rate was 14%); *In re Courtland Estates*, 144 B.R. at 9 (enforcing default rate of 18% where the pre-default rate was 15%); *In re Skyler Ridge*, 80 B.R. 500, 511 (Bankr. C.D.Cal.1987) (stating the 14.75% default interest rate fell "well within the range of interest rates that the Court has seen frequently in recent years."). While the 8% difference between the non-default and default rates is large, it is not unprecedented. It is in fact slightly less than the default rate which was enforced in *Liberty Warehouse*.

As noted in *In re Liberty Warehouse*,

the spread between the non-default and default rates of interest (i.e. 8.8%) is smaller than the differential present in most cases where courts have found the default rate to constitute a penalty. *See, e.g., Kalian*, 178 B.R. at 309 (18% spread); *Boardwalk Partners*, 171 B.R. at 92 (14.5% differential); *Hollstrom*, 133 B.R. at 537 n. 3–4 (24% spread); DWS Investments, 121 B.R. at 849 (9–10% differential); *White*, 88 B.R. at 499 (35% spread).

220 B.R. at 552. The court finds that the default rate is not so high as to be inherently unacceptable.

■■■ The courts also focus on the status of the interests which will bear the adverse effects of allowance of a default rate. *See e.g. In re Kalian*, 178 B.R. at 316; *In re Consolidated Properties Ltd. Partnership*, 152 B.R. at 455–57; *In re Hollstrom*, 133 B.R. at 538; *Skyler Ridge*, 80 B.R. at 510. If non-insider creditors, whether unsecured or secured, would bear the adverse effects of allowance of default rates to oversecured creditors, this court would not be inclined to allow such default rates. This would particularly be true in a case such as this, in which the default rate is 8% higher than the non-default rate and the amount at issue is approximately $900,000. In most bankruptcy cases undersecured and unsecured creditors receive less than the full amount due, and

often they receive nothing. In such circumstances equity will not ordinarily favor allowing oversecured creditors default interest rates.

In this case, however, the party which will bear the adverse effect is DKM, the debtor's general partner. The distribution on DKM's unsecured claim of $2,695,819.86 will be reduced from approximately $1,845,847. by the amount of any default interest allowed to the secured creditors.

As the lenders acknowledged at the confirmation hearing, the mere fact that DKM is an insider is not cause to subordinate its unsecured claim. Nor has cause been shown for equitable subordination of DKM's claim under Code section 510(c). Barclays originally argued that DKM had misrepresented to Barclays the amount of the equity with which it was capitalizing the debtor at the time of the loan, but the debtor disputed that. Because the debtor voluntarily classified DKM's claim in the plan to provide it payment only after the secured creditors are paid in full, Barclays withdrew the equitable subordination argument, and with it the allegation of misrepresentation at the time of the loan.

It does not follow, however, that DKM's status as an insider is irrelevant. An "insider" of a partnership as defined by Code section 101(31)(C) includes a general partner or other person in control of the debtor. The Code provides different treatment to insiders than non-insiders for a number of purposes.[3] Such differences reflect the identity of interests between the debtor and an insider, or at least the favored position which an insider is likely to have with the debtor.

In this case, it was DKM, as general partner of the debtor, which exercised its authority to file a bankruptcy petition on behalf of the debtor. As previously noted, DKM did so for the sole purpose of avoiding the obligation to pay the default interest rate to the secured creditors. The debtor admitted as well at the confirmation hearing that absent the bankruptcy, the secured creditors would have been entitled to the default rate:

> THE COURT: Absent the bankruptcy, if they were paid at that point in time, when in fact they were paid, they would have been entitled under the contract, to a greater rate of interest, correct, to the default rate?

> MR. BURRICK: If there was no bankruptcy, that's correct.

(Tr. 7/20/98 39:20–25.)

The bankruptcy was filed, in other words, for the sole purpose of attempting to modify the secured creditors' contractual rights for the benefit of the debtor's general partner.

The ultimate question is whether the debtor has met its burden of proving equities sufficient to rebut the secured creditors' entitlement under New York law to interest at a default rate. The court holds that the debtor has not met that burden. Although the amount in question is large, the debtor agreed to the default rates when it contracted for the loans. No one forced the debtor to borrow from a New York bank on terms including governance by New York law. The debtor alone controlled the timing of its efforts to market the property as the maturity date approached, and the decision to seek refinancing or not.[4] The debtor alone knows the reasons for the choices which it made to arrive at this point. There is nothing in the record which constitutes a justification for relieving the debtor and its general partner, which are sophisticated parties, from the burdens of the debtor's contracts with the secured creditors. The debtor could not achieve that result outside of bankruptcy, and there is nothing in the record which suggests why the result should be different in a bankruptcy case which was filed solely to avoid the state law result. The court concludes that the secured creditors are entitled to interest at the default rate.

---

3. *See* Code sections 303(b)(2), 502(b)(4), 523(a)(2), 547(b)(4), 550(c), 702(a)(3), 727(a)(7), 747(1), 1104(c)(2) and 1129(a)(10).

4. The debtor did not "aggressively pursue" refinancing because of its negotiations to sell the property to Federal Investment Realty Trust. Affidavit of Donald M. Slaght in opposition to Barclays' motion to dismiss, filed June 24, 1997 ¶ 6.

## C. The Secured Creditors Are Not Entitled to the 5% Late Charge.[5]

██ The secured creditors assert that they are entitled to a 5% late charge in addition to interest at the default rate. The Barclays note provides for such late charge in addition to default rate interest. Barclays therefore asserts entitlement to a late charge of $40,877.21 on the past due default rate interest. Pathmark has not asserted a claim for late charges. Oversecured creditors cannot receive both interest at default rates and late charges. *In re Vest Associates,* 217 B.R. 696, 701 (Bankr.S.D.N.Y.1998); *In re 1095 Commonwealth Ave., Corp.,* 204 B.R. 284, 305 (Bankr.D.Mass.1997); *In re Kalian,* 178 B.R. 308, 312 n. 9 (Bankr.D.R.I.1995) (citing cases). Since the court has already determined to allow the secured creditors interest at a default rate, late charges will not be allowed.

## D. The Secured Creditors Are Not Entitled to Receive Interest on the Default Interest.

██ The secured creditors assert that they are also entitled to interest on the post-petition default interest they receive under section 506(b). The secured creditors assert that the post-petition interest which accrues under section 506(b) becomes part of their oversecured claim under *Rake v. Wade,* 508 U.S. 464, 113 S.Ct. 2187, 124 L.Ed.2d 424 (1993). They argue that because *Rake* requires payment of interest on all oversecured claims, they are entitled to interest on the post-petition interest which accrues pursuant to section 506(b).

The debtor contends that Rake is inapplicable to the instant case. The debtor points out that *Rake* addressed a secured creditor's entitlement to interest on pre-petition arrearages which included interest and not to a secured creditor's entitlement to interest on post-petition interest.

The secured creditors' interpretation of section 506(b) is unsupportable. First, as the debtor points out, *Rake v. Wade* is factually

distinguishable from the instant case. In *Rake,* the debtor had fallen behind on his mortgage payments. 508 U.S. at 466, 113 S.Ct. 2187. The mortgage payments were comprised of principal and interest. Subsequently, the debtor filed a chapter 13 petition. *Id.* In his chapter 13 plan, the debtor proposed to pay off the arrearages without interest during the life of the plan. *Id.* The court held that, under section 506(b) the debtor was required to pay interest on the arrearages. *Id.* at 472, 113 S.Ct. 2187.

As a result, *Rake* held that section 506(b) requires interest to be paid on pre-petition arrears even if part of the arrears is interest. *Rake* did not interpret section 506(b) to award interest on post-petition interest accrued under section 506(b). The amount of an allowed claim is determined as of the petition date under Code section 502(b). In allowing post-petition interest on oversecured claims, Code section 506(b) does not state that interest shall be provided on post-petition interest as well.

Additionally, the secured creditors have cited no cases which advance their interpretation of *Rake.* Moreover, the secured creditors admit that their notes do not provide for interest on interest, let alone interest on default interest. Finally, if it is not equitable to award late charges in addition to interest at a default rate, it is not equitable to award interest on interest at a default rate. Such compensation would be excessive. That request is therefore denied.

## CONCLUSION

For the reasons stated above, Barclays is allowed additional interest of $817,544.24 and Pathmark is allowed additional interest of $39,416.58. The secured creditors' other claims are denied. Since the parties have agreed that all requirements for confirmation of the plan under Code section 1129 have been met, and that the plan can be confirmed regardless of who prevails on the issues addressed herein, the plan is confirmed with the modifications noted herein. Barclays

---

**5.** The analysis in this section does not pertain to the secured creditors' right to attorneys' fees.

shall submit an order within ten days under D.N.J.LBR 9072–1(c).