SW BOSTON HOTEL VENTURE, LLC, et al.,[1] Debtors.

The Prudential Insurance Company of America, Appellant/Cross–Appellee,

v.

City of Boston, Appellee,

and

SW Boston Hotel Venture, LLC, et al., Appellees/Cross–Appellants.

BAP Nos. MB 11–079, MB 11–082, MB 11–085, MB 11–086.

Bankruptcy No. 10–14535–JNF.

United States Bankruptcy Appellate Panel for the First Circuit.

Oct. 1, 2012.

1. The "Debtors" are SW Boston Hotel Venture LLC ("SW Boston") (Case No. 10–14535–JNF), Auto Sales & Service, Inc. (Case No. 10–14528–JNF), General Trading Company (Case No. 10–14532–JNF), Frank Sawyer Corporation (Case No. 10–14533–JNF), 100 Stuart Street LLC (Case No. 10–14534–JNF), 30–32 Oliver Street Corporation (Case No. 10–16173–JNF), General Land Corporation (Case No. 10–16174–JNF), and 131 Arlington Street Trust (Case No. 10–16177–JNF).

Gina L. Martin Esq., and Emanuel C. Grillo, Esq., on brief for Appellant/Cross–Appellee.

Joseph F. Ryan, Esq., and E. Kate Buyuk, Esq., on brief for Appellee, City of Boston.

Harold B. Murphy, Esq., Charles R. Bennett, Jr., Esq., and John C. Elstad, Esq., on brief for Appellees/Cross–Appellants.

Before HAINES, DEASY, and TESTER, United States Bankruptcy Appellate Panel Judges.

DEASY, Bankruptcy Judge.

The Prudential Insurance Company of America ("Prudential") appeals from the following orders of the bankruptcy court: (1) the October 4, 2011 order (the "506(b) Order") granting, in part, and denying, in part, the Motion of The Prudential Insurance Company of America for an Order Authorizing the Application of Payments Received during the Chapter 11 Cases to Payment of Postpetition Interest Pursuant to Section 506(b) of the Bankruptcy Code;[2] and (2) the Order Fixing Amount of Allowed Prudential Secured Claim as of October 4, 2011 (the "Prudential Claim Order") entered by the bankruptcy court on October 20, 2011. The Debtors filed cross-appeals with respect to both orders, arguing that the bankruptcy court erred by awarding Prudential interest at the default rate (the "Default Rate Calculation"). For the reasons set forth below, we **AFFIRM** in part, **REVERSE** in part, and **REMAND** both orders for further proceedings consistent with this opinion.

## BACKGROUND

In 2007, the Debtors, a group of affiliated companies run by Carol Sawyer Parks, sought financing for the development of certain property located at 100 Stuart Street, Boston, Massachusetts (the "Property"). *See In re SW Boston Hotel Venture, LLC,* 449 B.R. 156, 159 (Bankr. D.Mass.2011) (reciting stipulated facts in connection with Prudential's motion to lift stay) (the *"Lift Stay Decision"*). This development became the "W" Hotel and Residences, a mixed-use property located in Boston's downtown theater district, consisting of a hotel (the "Hotel"), residential condominiums (the "Residences"), a parking garage, restaurant, lobby bar, retail store, spa, and theme bar. *Id.* SW Boston was formed to own and operate the Debtors' main assets, the Hotel and Residences.

### A. The Prudential Loan

After financing with another lender fell through, Prudential agreed to finance the construction of the project. In January 2008, Prudential and SW Boston entered into a Construction Loan Agreement, whereby Prudential agreed to provide up to $192.2 million in financing to SW Boston (the "Prudential Loan"). *See Lift Stay Decision,* 449 B.R. at 160.[3] The Construction Loan Agreement provided for the payment of interest at the rate of 9.5% per annum, and that after the occurrence of an event of default (as defined therein), the interest rate would increase to a default rate of 14.5%. In addition to scheduled debt service payments, the Debtors were required to pay Prudential 92% of the

---

**2.** Unless expressly stated otherwise, all references to "Bankruptcy Code" or to specific statutory sections shall be to the Bankruptcy Reform Act of 1978, as amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), Pub. L. No. 109–8, 119 Stat. 23, 11 U.S.C. § 101, *et seq.* All references to "Bankruptcy Rules" shall be to the Federal Rules of Bankruptcy Procedure.

**3.** SW Boston ostensibly issued a Promissory Note to Prudential for the full amount of the loan. Although the Construction Loan Agreement references a Promissory Note in the amount of $190,255,000.00, Prudential did not attach it to its proofs of claim, and did not offer it into evidence during the proceedings relevant to this appeal.

proceeds of each Residence sale as it occurred.

### 1. Prudential's Collateral

To secure SW Boston's obligations under the Construction Loan Agreement, SW Boston granted Prudential, among other things, a first priority mortgage and security interest on SW Boston's real and personal property, and all proceeds from the sale of the foregoing. *See Lift Stay Decision*, 449 B.R. at 160. SW Boston also executed pledge agreements and account control agreements in favor of Prudential with respect to two accounts in SW Boston's name at Sovereign Bank. In addition to the collateral provided by SW Boston, certain of the Debtors other than SW Boston (the "Affiliated Debtors") provided guarantees and pledged additional collateral as security. *See Lift Stay Decision*, 449 B.R. at 160–61.

### 2. Letter of Credit

Under the Construction Loan Agreement, one of the Affiliated Debtors, Frank Sawyer Corporation, was required to arrange for the issuance of a letter of credit for Prudential's benefit as additional security for the loan. As a result, two of the Debtors' non-debtor affiliates, SE Berkeley Street, LLC and SW McClellan Highway, LLC, obtained from Sovereign Bank a letter of credit in favor of Prudential in the approximate amount of $17.3 million (the "Letter of Credit"). *See Lift Stay Decision*, 449 B.R. at 161.

### B. The City Loan

After construction of the project was underway, the City of Boston agreed to lend SW Boston an additional $10.5 million under the terms of a Subordinate Loan Agreement (the "City Loan") to complete construction of certain amenities and facilities. *See Lift Stay Decision*, 449 B.R. at 161. As security for the City Loan, the Debtors granted to the City of Boston a second priority security interest and mortgage on much of the same collateral on which Prudential had a first lien. *Id.* Prudential and the City of Boston entered into an Intercreditor and Subordination Agreement, under which the City of Boston agreed, among other things, to subordinate its liens against, and right to payment from, the collateral pledged to both of them. *See In re SW Hotel Venture, LLC*, 460 B.R. 4, 17 (Bankr.D.Mass.2011) (the "*506(b) Decision* ").

### C. The Commencement of Bankruptcy Proceedings

On April 28, 2010 (the "petition date"), SW Boston and four of the Affiliated Debtors filed chapter 11 petitions. The other Affiliated Debtors filed chapter 11 petitions on June 4, 2010. Shortly after the petition date, Prudential drew the full amount of the Letter of Credit ($17.3 million), and applied the funds to the principal balance due on the Prudential Loan.

### 1. The Debtors' Use of Cash Collateral

From the inception of the cases, the Debtors requested authority from the bankruptcy court to use Prudential's cash collateral, i.e. Hotel-related revenue and the proceeds of the sale of the Residences. Although Prudential objected in most instances, the bankruptcy court regularly allowed the Debtors to use cash collateral.

### 2. The Lift Stay Motion

In August 2010, Prudential filed a Motion for Relief from the Automatic Stay pursuant to § 362(d)(1) and (d)(2) (the "Lift Stay Motion") so that it could enforce its rights and remedies under the loan documents. Prudential argued that it was entitled to relief from stay because, among other things, SW Boston did not have sufficient Residence sales, had not completed the theme bar, could not close

existing Residence sales or obtain new sales, and did not have the ability to emerge successfully from chapter 11. The Debtors opposed the motion asserting, among other things, that Prudential's interest in the Hotel and Residences was more than adequately protected by its collateral and by SW Boston's continued operation of the Hotel and sales and leases of the Residences. According to the Debtors, Prudential's interest in the Hotel and Residences was being enhanced by the completion of the spa and theme bar using the proceeds of the City Loan, and the Debtors' successful reorganization was in progress.

In November 2010, the bankruptcy court conducted a three-day evidentiary hearing on the Lift Stay Motion that involved multiple expert witnesses and extensive exhibits. *See Lift Stay Decision*, 449 B.R. at 158–59. At the hearing, the bankruptcy court heard expert testimony as to the value of the Hotel and Residences, and admitted into evidence competing appraisals of the Hotel and Residences, and stipulated values for other collateral. *See id.* On January 28, 2011, the bankruptcy court entered an order denying Prudential's Motion for Relief from the Automatic Stay. In the bankruptcy court's extensive Lift Stay Decision, the bankruptcy court scrutinized the competing valuation evidence submitted by the parties, and ultimately found that the Hotel was worth $65,600,000 and the unsold Residences were worth $88,000,000. *Id.* at 172–173. The bankruptcy court also accepted the stipulated value of the other collateral as $14,754,000, for an aggregate collateral value of $168,354,000. *Id.* at 171–73. The bankruptcy court found the value of Prudential's claims to be $154,000,000. *Id.* at 161–62.

In denying relief from stay, the bankruptcy court concluded that Prudential had not demonstrated cause for relief from stay due to lack of adequate protection under § 362(d)(1). Noting that Prudential did not introduce evidence of lack of adequate protection at trial and did not address it in its brief, the bankruptcy court stated: "Given the total value of the collateral package, an equity cushion exists with respect to Prudential's claim in an amount in excess of $19 million." *Id.* at 176. The bankruptcy court also noted that the Debtors were reducing the amount of debt owed to Prudential from the proceeds of the Residence sales, and that the value of the collateral was not declining. The bankruptcy court concluded, therefore, that Prudential did not lack adequate protection. *Id.*

The bankruptcy court also held that Prudential was not entitled to relief from stay under § 362(d)(2). In its analysis, the bankruptcy court found that SW Boston lacked equity in the Hotel and Residences, even though the "total value of the collateral package" provided Prudential with an equity cushion. *Id.* at 176 and 178. However, the bankruptcy court also found that the Debtors had sustained their burden of demonstrating that a plan of reorganization was in prospect, and, therefore, that the Property was necessary for their reorganization.

### 3. The Hotel Sale

On March 28, 2011, the Debtors filed a motion requesting approval of a purchase and sale agreement to sell the Hotel and Residences and certain other related facilities to an unrelated third party for $89.5 million (the "Hotel Sale"). This amount was substantially more than the opinions expressed by both parties' appraisers and the value determined by the bankruptcy court when denying the Lift Stay Motion. *See Lift Stay Decision*, 449 B.R. at 162–173. The bankruptcy court entered an order approving the Hotel Sale on May 24,

2011. The Hotel Sale closed on June 8, 2011, and the $83,322,017 net proceeds of the Hotel Sale were paid to Prudential, thereby reducing the amount of outstanding principal balance of Prudential's claim.

#### 4. The Plan

On March 31, 2011, prior to the closing on the Hotel Sale, the Debtors filed a Joint Plan of Reorganization and a Disclosure Statement. Prudential objected to the Disclosure Statement and, on May 5, 2011, the Debtors filed a First Amended Joint Plan of Reorganization, with an Amended Disclosure Statement. On May 24, 2011, the bankruptcy court approved the Amended Disclosure Statement and scheduled a confirmation hearing. On June 24, 2011, Prudential filed an objection to the First Amended Plan, and, on June 27, 2011, the Debtors filed a Modified First Amended Joint Plan of Reorganization (the "Plan").

The Plan divided creditors and other interests into nine classes and proposed to pay in full all allowed claims filed by non-insiders, using income generated by the Debtors' operations, the sale of the remaining residences in the ordinary course of SW Boston's business, and the liquidation of certain assets of the Debtors. The Plan defined Prudential's allowed secured claim as "$180,803,186.86 less all payments made to, or received by, Prudential on account of its Claims against the Debtors from the Petition Date through the Effective Date ..." or such other amount as determined by the bankruptcy court. According to the Plan, Prudential's allowed Class 2 claim would be paid in full prior to March 31, 2014, with post-confirmation interest at a rate of 4.25%, or such other rate as determined by the bankruptcy court. The Plan also proposed that Prudential would retain its prepetition liens on the Debtors' property and it would be paid the "Residence Net Sales Pro-ceeds," the sales price of the condominiums, less 8% for closing costs and the amount necessary to pay outstanding real estate taxes and condominium fees, as well as budgeted operating expenses. Prudential also would receive, on a monthly basis, the aggregate of the Debtors' cash in excess of working capital amounts.

In its objection, Prudential asserted numerous flaws with the Plan, including that the Plan failed to satisfy multiple provisions of § 1129, such as § 1129(a)(3), (a)(7), (a)(11) and (b)(2). Prudential also argued that the Plan fixed its claim at an amount vastly below what the circumstances and the Bankruptcy Code require because it failed to calculate properly the postpetition interest to which Prudential was entitled, and because the Plan allowed payments on Prudential's claims to be made over time at a below-market rate of interest.

#### 5. The 506(b) Motion

On April 15, 2011, Prudential filed a Motion of The Prudential Insurance Company of America for an Order Authorizing the Application of Payments Received During the Chapter 11 Cases to Payment of Postpetition Interest Pursuant to Section 506(b) of the Bankruptcy Code (the "506(b) Motion"). In the 506(b) Motion, Prudential sought a declaration that it was oversecured and, therefore, entitled under § 506(b) to recover postpetition interest from the petition date at the default rate set forth in loan documents executed by the parties, as well as attorneys' fees, costs, and charges. Prudential also sought to apply all postpetition payments received during the chapter 11 proceedings first to postpetition interest and then to the principal balance of its claim. The Debtors opposed the 506(b) Motion, asserting that Prudential's claim was undersecured as to SW Boston until the closing of the Hotel Sale on June 8, 2011, and as such, Pruden-

tial was not entitled to postpetition interest, fees and costs from the petition date. Furthermore, the Debtors asserted that the default rate of interest should not be allowed as it was an unreasonable penalty and would be inequitable under the circumstances. The Official Committee of Unsecured Creditors and the City of Boston also filed objections to the 506(b) Motion.

## D. The Combined Hearing

On June 27–29, 2011, the bankruptcy court held a combined evidentiary hearing (the "Combined Hearing") on Prudential's 506(b) Motion and confirmation of the Plan. At the Combined Hearing, Joanna Mulford ("Ms. Mulford"), a Vice President of Prudential, testified on behalf of Prudential. Her Declaration was introduced into evidence as her direct testimony, and she was cross-examined by Debtors' counsel pursuant to an agreement of the parties. Ms. Mulford indicated that the principal amount of Prudential's loan had been reduced from $180.8 million to $163.5 million by application of $17.3 million attributable to the Letter of Credit proceeds. She also reported that the Debtors had paid Prudential approximately $22.2 million from the sale of Residences. She compared the amount due Prudential for postpetition interest, as of April 25, 2011, prior to the sale of the Hotel in June of 2011, using the non-default contract rate of interest and the default rate of interest. Using the 9.5% contract rate, Ms. Mulford calculated interest owed at $16,209,512.78. Using the 14.5% default rate of interest, she calculated interest owed at $24,740,835.30. Ms. Mulford, however, did not explain how she actually computed those figures.

Ms. Mulford testified that she was responsible for the loan after it was originated and that another group, "[o]n the portfolio side," actually originated the loan. She also testified that the rates of interest set forth in the Construction Loan Agreement were predicated on similar loans in the market at the time of the loan's origination, "whether it be a loan that we're originating or a loan that we're actually taking out on one of our properties." She added that she did not engage in any analysis with respect to the anticipated costs, or losses, that Prudential might sustain as a result of a default, or whether the 5% spread between the non-default and default rates reasonably anticipated Prudential's costs or expenses in the event of a default. In fact, she admitted that she made no inquiries to determine on what basis they established the default rate of interest. On redirect examination, Ms. Mulford re-emphasized that interest rates in the Construction Loan Agreement were similar to those in situations where Prudential had acted as either a lender or a borrower.

## E. The 506(b) Decision

On October 4, 2011, the bankruptcy court entered its 506(b) Order granting, in part, and denying, in part, the 506(b) Motion. In its accompanying 506(b) Decision, the bankruptcy found that Prudential first became oversecured and entitled to accrue postpetition interest from June 8, 2011, the date of the closing of the Hotel Sale, through confirmation, at the default rate of interest. In so holding, the bankruptcy court, following precedent set forth by the Fifth Circuit in *T–H New Orleans, infra,* applied a flexible approach as to the timing of the determination of Prudential's secured status for § 506(b) purposes. The bankruptcy court rejected Prudential's argument that it was entitled to postpetition interest from the petition date, finding that Prudential had not established that it was a fully secured creditor from the petition date forward. Instead, the bankruptcy court found that the date of the closing of the Hotel Sale was the appropriate time for fixing Prudential's oversecured status

because, on that date, it was unequivocally established and beyond dispute that Prudential was an oversecured creditor.

The bankruptcy court also determined that Prudential was entitled to postpetition interest at the default rate of 14.5% and that such rate was not a penalty as contended by the Debtors. In ruling that Prudential was entitled to the default rate of interest, the bankruptcy court relied on testimony at the Combined Hearing that the non-default and default rates of interest set forth in the applicable loan documents were similar to and predicated upon those set forth in other loans in the market at that time.

As to Prudential's request under § 506(b) for reasonable attorneys' fees, costs, and other charges, the bankruptcy court determined that Prudential had not met its burden of establishing that the fees and charges were authorized by the applicable loan documents, or that they were necessary and reasonable. In so holding, the bankruptcy court pointed out that Prudential had not introduced into evidence the applicable promissory note or mortgage that allegedly entitled it to recover fees, costs, and other charges, nor did it provide a statement or itemization of its fees and costs.

Thereafter, on October 20, 2011, the bankruptcy court entered the Prudential Claim Order determining, based on the 506(b) Decision, that Prudential had an allowed secured claim as of October 4, 2011, in the amount of $51,835,721. In determining the amount of Prudential's allowed secured claim, the bankruptcy court determined that Prudential was not entitled to postpetition interest computed on a compounded basis as the Construction Loan Agreement did not provide for compound interest.

Prudential appealed both the 506(b) Decision and the Prudential Claim Order, and the Debtors filed cross-appeals relating to both orders. Neither party sought a stay of either order pending appeal.

### F. Plan Confirmation

On November 14, 2011, the bankruptcy court entered an order and accompanying decision confirming the Plan (the "Confirmation Decision"), and an order overruling Prudential's objection to confirmation of the Plan (the "Confirmation Order").[4] Prudential appealed the Confirmation Order and Decision, and that appeal is currently pending before the Panel.[5] Prudential sought a stay of the Confirmation Order pending appeal from both the bankruptcy court and the Panel, both of which were denied. Without a stay, the Plan became effective on December 1, 2011.

While these appeals were in briefing, the Debtors filed motions to dismiss, arguing that the appeals should be dismissed as moot as the Debtors' confirmed Plan has been substantially consummated and appellate relief cannot be granted without "eviscerating" the Debtors' reorganization, completely undoing multiple consummated transactions made in reliance on the confirmed Plan's finality, and causing harm to third parties not before the court. In orders dated March 12, 2012, the Panel denied the motions to dismiss, reasoning that although the Plan has been substantially consummated, Prudential is willing to accept alternative forms of relief that would not require an unraveling of the reorganization, and reversal of the Plan confirmation would not adversely affect any innocent third parties.

### *JURISDICTION*

Before addressing the merits of an appeal, the Panel must determine that

---

**4.** *See In re SW Boston Hotel Venture, LLC,* 460 B.R. 38 (Bankr.D.Mass.2011).

**5.** *See* BAP No. MB 11–087.

it has jurisdiction, even if the issue is not raised by the litigants. *See Boylan v. George E. Bumpus, Jr. Constr. Co. (In re George E. Bumpus, Jr. Constr. Co.)*, 226 B.R. 724 (1st Cir. BAP 1998). The Panel has jurisdiction to hear appeals from: (1) final judgments, orders, and decrees; or (2) with leave of court, from certain interlocutory orders. 28 U.S.C. § 158(a); *Fleet Data Processing Corp. v. Branch (In re Bank of New England Corp.)*, 218 B.R. 643, 645 (1st Cir. BAP 1998). A decision is considered final if it "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment," *id.* at 646 (citations omitted), whereas an interlocutory order " 'only decides some intervening matter pertaining to the cause, and . . . requires further steps to be taken in order to enable the court to adjudicate the cause on the merits.' " *Id.* (quoting *In re American Colonial Broad. Corp.*, 758 F.2d 794, 801 (1st Cir.1985)).

■ The underlying decisions and orders of the bankruptcy court determined whether and in what amount Prudential was entitled to postpetition interest pursuant to § 506(b). Generally, a bankruptcy court order regarding a secured creditor's entitlement to postpetition interest pursuant to § 506(b) is a final, reviewable order. *See, e.g., Fin. Sec. Assur. Inc. v. T–H New Orleans Ltd. P'ship (In re T–H New Orleans Ltd. P'ship)*, 116 F.3d 790 (5th Cir. 1997) (reviewing bankruptcy court's ruling

that appellant was not entitled to postpetition interest from the petition date).

## STANDARD OF REVIEW

The Panel applies the clearly erroneous standard to findings of fact and *de novo* review to conclusions of law. *See Lessard v. Wilton–Lyndeborough Coop. School Dist.*, 592 F.3d 267, 269 (1st Cir.2010).

## DISCUSSION

■ Prudential argues that the bankruptcy court erred by awarding postpetition interest only from the date of the Hotel Sale, and that it was entitled to postpetition interest from the petition date because: (1) it was oversecured at confirmation; and/or (2) it was oversecured throughout the bankruptcy proceedings, as evidenced by the bankruptcy court's findings in the Lift Stay Decision.[6] Prudential also argues that the bankruptcy court erred by concluding that it was not entitled to accrue postpetition interest on a compounded basis. In their cross-appeals, the Debtors argue that the bankruptcy court erred by awarding Prudential postpetition interest at the default rate.

## I. Whether Prudential Was Entitled to Accrue Postpetition Interest From the Petition Date.

### A. Prudential's entitlement to postpetition interest

■ Section 506(b) governs a creditor's entitlement to postpetition interest, and provides that:

---

**6.** Although Prudential argues generally that it is entitled to fees and expenses in addition to postpetition interest, it did not brief any issues relating to the bankruptcy court's ruling that Prudential had not proven that the claimed fees and expenses were authorized by the loan documents and that they were necessary and reasonable. Therefore, any argument on the issue of postpetition fees and expenses is waived. *See Tower v. Leslie–Brown*, 326 F.3d 290, 299 (1st Cir.2003)

("[W]e have made it abundantly clear that failure to brief an argument does, in fact, constitute waiver for purposes of appeal."); *see also Furness v. Wright Med. Tech., Inc. (In re Mercurio)*, 402 F.3d 62, 64 n. 1 (1st Cir. 2005) (holding that failure to brief an argument constitutes waiver); *García–Ayala v. Lederle Parenterals, Inc.*, 212 F.3d 638, 645 (1st Cir.2000) (same); *Blacksmith Invs., Inc. v. Woodford (In re Woodford)*, 418 B.R. 644, 646 n. 1 (1st Cir. BAP 2009) (same).

To the extent that an allowed secured claim is secured by property the value of which ... is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement or State statute under which such claim arose.

11 U.S.C. § 506(b). As the U.S. Supreme Court has made clear, under § 506(b), a creditor is unqualifiedly entitled to postpetition interest on its oversecured claim, whether or not the loan documents upon which the claim is based provide for such interest. *See United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989); *see also Rake v. Wade*, 508 U.S. 464, 113 S.Ct. 2187, 124 L.Ed.2d 424 (1993).

According to § 506(b)'s express terms, a secured creditor can only accrue postpetition interest on its claim if it is oversecured and then only to the extent it is oversecured. *See United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 372–73, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988). Thus, the first inquiry under § 506(b) is usually a determination of whether the creditor is oversecured. *In re T–H New Orleans*, 116 F.3d at 797. The creditor who claims entitlement to postpetition interest bears the burden of proving, by a preponderance of evidence, that its claim is oversecured, "to what extent, and for what period of time." *T–H New Orleans*, 116 F.3d at 798 (citing *Heritage Bank Tinley Park v. Steinberg (In re Grabill Corp.)*, 121 B.R. 983, 991–92 (Bankr.N.D.Ill.1990)).

A creditor is considered to be oversecured when the value of its collateral exceeds the amount of the creditor's allowed claim. *See Ron Pair Enters.*, 489 U.S. at 239, 109 S.Ct. 1026; *see also Baybank–Middlesex v. Ralar Distribs., Inc.*,

69 F.3d 1200, 1202 (1st Cir.1995). Section 506(a) establishes the extent to which an allowed claim is a secured claim. "An allowed claim of a creditor secured by a lien on property in which the estate has an interest ... is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property...." 11 U.S.C. § 506(a). Valuations under § 506(a) are to be made "in light of the purpose of the valuation and of the proposed disposition or use of" the collateral. *Id.*

The parties do not dispute that Prudential is entitled to some amount of postpetition, pre-confirmation interest on its claim. They disagree, however, as to the appropriate time for the valuation determination under § 506(a), and when Prudential's right to postpetition interest accrued. Prudential argues that it is entitled to postpetition interest from the petition date either because it was oversecured *at confirmation*, or because the bankruptcy court's earlier findings prove that it was oversecured throughout these proceedings. The Debtors argue that Prudential was not entitled to postpetition interest from the petition date because Prudential had not met its burden of establishing that it was oversecured on that date. Thus, the question here is when should the valuation of the collateral and the claim occur for the purpose of determining a secured creditor's entitlement to postpetition interest under § 506(b)?

### B. The valuation determination

As the bankruptcy court remarked:

The timing of the comparison between the amount of debt and the value of the collateral required by § 506(a) and (b) is crucial in determining the allowed amount of the secured claim and whether the secured creditor is oversecured. The bankruptcy court must determine

the appropriate date for assessing the value of collateral, as values may decrease, increase or fluctuate over time during the pendency of the case, as evidenced by what has transpired in the Debtors' cases where both the amount of debt and the value of the collateral have declined due to payments to Prudential and sales of the Hotel and Residences, respectively. Thus, the application of § 506(a) and (b) often presents difficulties in the context of determining a secured creditor's entitlement to postpetition interest during the pendency of the [c]hapter 11 case (often referred to as "pendency interest") where a debtor has made significant payments to the secured creditor and substantially paid down the balance owed to the creditor during the case due to sales of assets or the appreciation of the value of the secured creditor's collateral during the case.

*506(b) Decision,* 460 B.R. at 26.

Neither the Bankruptcy Code nor the Bankruptcy Rules define or establish the appropriate point in a reorganization proceeding for the valuation determination under § 506(a), and, as a result, several approaches have emerged. *See Official Comm. of Unsecured Creditors v. Liberty Sav. Bank, FSB (In re Toy King Distribs., Inc.),* 256 B.R. 1 (Bankr.M.D.Fla.2000) (discussing different approaches). Some courts have held that a creditor's secured claim is always determined on a specific date, i.e., either the petition date or the confirmation date.[7] Courts applying this "single valuation approach" rely on the Supreme Court's ruling in *Timbers, supra,* that an undersecured creditor whose collateral is not declining during the pendency of a bankruptcy case is not entitled to postpetition interest. Accordingly, under this approach, if a secured claim is not fully secured on the specific date, the secured creditor will not be entitled to any postpetition interest under § 506(b).

Other courts utilize a "dual valuation approach," determining a creditor's secured status twice, once at the petition date and once at the hearing on plan confirmation.[8] Those courts reason that it is necessary to determine secured status through valuation at the outset of the case for adequate protection purposes, and at confirmation for the purpose of determining treatment under the plan and reducing the amount of the secured claim by any payments made by the debtor. "If the collateral package at the time of confirmation exceeds the amount of the creditor's total prepetition claim, the creditor is entitled to interest and costs under [§ ] 506(b) to the extent of the surplus." *In re Addison Props.,* 185 B.R. at 784.

The majority of courts, however, use a more flexible approach, looking to the circumstances of each case and the purpose of the valuation. They do not pick a specific point in time for the debt/value comparison, focusing instead on the matter before the court. This flexible approach was adopted by the Fifth Circuit in *T-H New Orleans, supra.* In that case, the bankruptcy court made a finding early in the case that the secured creditor was

---

7. *See, e.g., Cmty. Bank of Homestead v. Torcise (In re Torcise),* 187 B.R. 18, 23 (S.D.Fla.1995) ("The amount by which a claim is oversecured must be determined as of the petition date"), *rev'd on other grounds,* 162 F.3d 1084 (11th Cir.1998); *NCNB Texas Nat'l Bank v. Hulen Park Place Ltd. (In re Hulen Park Place Ltd.),* 130 B.R. 39, 43 (N.D.Tex.1991) (issue of whether creditor is oversecured is determined as of the petition date); *In re Landing Assocs., Ltd.,* 122 B.R. 288, 293 (Bankr.W.D.Tex.1990) (measurement date is confirmation date).

8. *See, e.g., In re Addison Props. Ltd. P'ship,* 185 B.R. 766, 784 (Bankr.N.D.Ill.1995); *In re Kennedy,* 177 B.R. 967 (Bankr.S.D.Ala.1995).

substantially undersecured, but because of subsequent adequate protection payments and an increase in the value of the creditor's collateral, the creditor became oversecured prior to the effective date of the plan. 116 F.3d at 794–95. On appeal, the Fifth Circuit addressed the issue of whether courts must utilize a fixed point in the reorganization proceeding, such as the petition date or the date of plan confirmation, for the purposes of valuing secured collateral to determine whether a creditor is entitled to postpetition interest under § 506(b). Declining to follow the single point in time approach, the Fifth Circuit stated:

> ... [W]e conclude that for purposes of determining whether a creditor is entitled to accrue interest under § 506(b) in the circumstance where the collateral's value is increasing and/or the creditor's allowed claim has been or is being reduced by cash collateral payments, such that at some point in time prior to confirmation of the debtor's plan the creditor may become oversecured, valuation of the collateral and the creditor's claim should be flexible and not limited to a single point in time, such as the petition date or confirmation date.

*Id.* at 798. Thus, the Fifth Circuit held that the secured creditor's entitlement to accrue postpetition interest under § 506(b) begins at that point in time when it becomes oversecured. *Id.* at 799.

> The measuring date on which the status of a creditor's collateral and claim are compared is determinative of a creditor's right to accrue interest under § 506(b). Thus, a secured creditor's entitlement to accrue interest under § 506(b) matures at that point in time where the creditor's claim becomes oversecured.

*Id.*

Citing *T–H New Orleans* with approval, the bankruptcy court in *In re Urban Com-* *municators PCS Ltd. P'ship,* 379 B.R. 232 (Bankr.S.D.N.Y.2007), *aff'd in part and rev'd in part on other grounds,* 394 B.R. 325 (S.D.N.Y.2008), similarly held that bankruptcy courts have flexibility in determining whether a secured creditor is entitled to postpetition interest under § 506(b). As that court reasoned:

> Recognition of that flexibility is, after all, consistent with attention to the needs and concerns of junior creditors, and, more significantly, language in [§ ] 506(a) that bankruptcy courts engage in any analysis of collateral value "in light of the purpose of the valuation and the proposed disposition or use of such property." The statutory guidance appearing as part of [§ ] 506(a) is the antithesis of a hard-and-fast rule, and instead embodies a more functional approach.

*Id.* at 243. As mandated by § 506(a), the *Urban Communicators* court considered both the "disposition or use of the property" (the eventual sale of the property) and the "purpose of the valuation" (the allowance of a secured creditor's claim—specifically, whether the extent to which creditor should be able to collect its contractual entitlement from the proceeds of the collateral). *Id.* at 242. The court went on to say, however, that where collateral is actually sold during the pendency of the case, and the sale price was fair and the result of an arm's length transaction, courts should use the actual sale price, and not some earlier "hypothetical" valuation, to determine whether a creditor is oversecured and thus entitled to postpetition interest. *Id.* (citing *Ford Motor Credit Co. v. Dobbins,* 35 F.3d 860, 870 (4th Cir. 1994)). The court remarked:

> But acknowledging, as this Court does, that a bankruptcy court has flexibility in making a collateral valuation decision

does not mean that the Court should disregard the best evidence of collateral value—what the collateral actually fetched. Rather, that flexibility should permit this Court's resort to the best available evidence of collateral value except where the circumstances dictate a different approach.... This flexible approach, the Fifth Circuit noted [in *T–H New Orleans*], ensures that "any increase over the judicially determined valuation during the bankruptcy rightly accrues to the benefit of the creditor, and not to the debtor."

Importantly, in *T–H New Orleans*, there had not been an actual sale of the underlying secured asset. In this case, ... the secured asset has been sold in a good faith and arm's length transaction. This distinction is critical. It is settled law that the sale price in an arm's length transaction is the best evidence of an asset's market value. *T–H New Orleans* does not disturb this conclusion. While this Court endorses the "flexible approach" outlined in *T–H New Orleans*, the Court believes that in instances where an actual post-petition sale of a secured asset has occurred, the flexibility provided to bankruptcy courts is usually best employed by utilizing the sale price in a good faith transaction as the value of a secured asset—and that in any event, such an approach is the most sensible here.

*Id.* at 243–44(footnotes omitted).

■ We agree with the flexible approach espoused in *T–H New Orleans* and as applied by *Urban Communicators*. This case is similar to *Urban Communicators* in that the value of the secured collateral (primarily the Hotel and Residences) fluctuated during the case and the debt was reduced by adequate protection payments. In addition, an actual postpetition sale of a substantial portion of Pruden-

tial's collateral occurred in an arm's length transaction. Although the bankruptcy court cited both *T–H New Orleans* and *In re Urban Communicators* with approval in holding that the Hotel Sale was evidence establishing Prudential's oversecured status, it did not follow the reasoning of *Urban Communicators* in applying that evidence under a flexible approach to determine the point in time to apply the evidentiary determination. We find that the bankruptcy court erred in not doing so. Under the rationale set forth in *Urban Communicators*, the Hotel Sale price is the best evidence of the value of the Hotel and establishes that Prudential was oversecured throughout these bankruptcy proceedings.

In addition, whether the hypothetical stay relief value is used, or the actual later sale value is used, it appears that Prudential was fully secured from the petition date under the rationale in *Urban Communicators*, and by the statements of the bankruptcy court in the 506(b) Decision. See 460 B.R. at 26 ("all collateral ... is considered"), 30–31 (adopting *Urban Communicators* where a sale of the collateral has occurred). Although the values used in the stay relief hearing, other than the Hotel value, were stipulated by the parties solely for the purpose of that hearing, the bankruptcy court adopted the stipulated values for purposes of the § 506(b) hearing without objection. See 460 B.R. at 32–33. The values found by the bankruptcy court at the § 506(b) hearing support Prudential being fully secured as of the petition date.

### C. Prudential's argument

Prudential argues, that because the Plan provides for Prudential to receive deferred cash payments over time, § 1129(b)(2)(A)(i)(II) precludes the bankruptcy court from applying a flexible approach and requires that Prudential's col-

lateral be valued at the confirmation date. However, Prudential's argument has no support in the language of the Bankruptcy Code and is inconsistent with the holdings in *T–H New Orleans*, and other cases, that the right to accrue postpetition interest under § 506(b) begins at that point in time when a secured creditor becomes oversecured. *See T–H New Orleans*, 116 F.3d at 799.

 The bankruptcy court has flexibility regarding when the valuation is made. Where there has been an arm's length sale of collateral during the course of the bankruptcy case, that sale value is the best evidence of the collateral's value. *See Urban Communicators*, 379 B.R. at 243–44. Thus, Prudential was fully secured and, for the reasons discussed above, is entitled to postpetition interest from the petition date.

## II. Whether the Bankruptcy Court Erred in Concluding that Prudential Was Not Entitled to Postpetition Interest Computed on a Compounded Basis.

 "Compound interest is the periodic calculation of additional interest on the interest that has already come due." *Aceta v. Robinson*, 2000 Mass.App.Div. 155, 157, 2000 WL 777971 (Mass.App.Div.2000).

 Prejudgment interest rates are governed by state law. *See Loft v. Lapidus*, 936 F.2d 633, 639 (1st Cir.1991) (citations omitted). The general rule in Massachusetts is that in the absence of statutory or express agreement by the parties, interest is presumed to be simple interest. *See, e.g., Cherokee Nation v. United States*, 270 U.S. 476, 490, 46 S.Ct. 428, 70 L.Ed. 694 (1926) ("The general rule, even as between private persons, is that, in the absence of a contract therefor or some statute, compound interest is not allowed to be computed upon a debt."); *Berman v. B.C. Assocs.*,

219 F.3d 48, 50 (1st Cir.2000); *Coupounas v. Madden*, 401 Mass. 125, 514 N.E.2d 1316, 1321 (1987); *Shapiro v. Bailen*, 293 Mass. 121, 199 N.E. 315, 316 (1936); *D'Annolfo v. D'Annolfo Constr. Co., Inc.*, 39 Mass.App.Ct. 189, 654 N.E.2d 82, 85 (1995) ("[C]ompounding cannot be done in the absence of express agreement"); *Thomas's Case*, 25 Mass.App.Ct. 964, 519 N.E.2d 786, 788 (1988) (disallowing compound interest except in certain proceedings in equity or by express statutory language); *Infolink Partners Ltd. P'ship v. Treasurer & Receiver Gen. of the Commonwealth of Massachusetts*, 2002 Mass.Super. LEXIS 563 (Mass.Super.Ct. May 1, 2002); *see also* S.R. Fulton, "Interest On Money Damages For Periods Before And After Judgment: A Guide For The Massachusetts Practitioner," 85 Mass. L. Rev. 146, 152 and n. 46–50 (2001). In *Berman v. B.C. Assocs.*, the First Circuit stated:

> In Massachusetts, compound interest is generally disfavored. *See Ellis v. Sullivan*, 241 Mass. 60, 134 N.E. 695, 697 (1922) (recognizing an " 'ancient unwillingness to allow compound interest' " (quoting *Lewin v. Folsom*, 171 Mass. 188, 50 N.E. 523, 524 (1898))). As early as 1906, the Supreme Judicial Court of Massachusetts decreed that interest is simple, "unless there is an express agreement to the contrary." *Inhabitants of Tisbury v. Vineyard Haven Water Co.*, 193 Mass. 196, 79 N.E. 256, 257 (1906); *see also Coupounas v. Madden*, 401 Mass. 125, 514 N.E.2d 1316, 1321 (1987); *Von Hemert v. Porter*, 52 Mass. 210, 218, 11 Metc. 210 (Mass.1846); *D'Annolfo v. D'Annolfo Constr. Co. [Inc.]*, 39 Mass.App.Ct. 189, 654 N.E.2d 82, 85 (1995). Consequently, compound interest is only permitted in certain proceedings in equity or by express statutory or contractual authority. *See Dunne v. City of Boston*, 41 Mass.App.Ct. 922,

671 N.E.2d 518, 520 (1996); *see also Shapiro v. Bailen,* 293 Mass. 121, 199 N.E. 315, 316 (1936) (recognizing exception in equity); *Ellis,* 134 N.E. at 697 (same).

219 F.3d at 50. It added that "the overwhelming majority of Massachusetts cases equate an interest rate 'per annum,' whether in a contract or a statute, with simple interest." *Id.* (citations omitted).

In the Prudential Claim Order, the bankruptcy court, citing *Berman,* denied compound interest because it found that the Construction Loan Agreement, which is governed by Massachusetts law, does not provide for compound interest either at the default rate or the non-default rate of interest. Prudential argues that the bankruptcy court erred because the Construction Loan Agreement expressly provides for compound interest in the definition of "Applicable Interest Rate," which is incorporated into the definition of "Default Rate."

Prudential did not introduce into evidence the applicable promissory note or mortgage, so the only loan document before the bankruptcy court was the Construction Loan Agreement. Section 1.1 of the Construction Loan Agreement is entitled "Definitions" and includes the following: "**Applicable Interest Rate**" shall mean 9.50% per annum, *compounding monthly.* (emphasis added).

Section 2.2 of the Construction Loan Agreement is entitled "Interest Rate" and provides, in relevant part, as follows:

2.2.1 *Applicable Interest Rate.* Except as herein provided with respect to interest accruing at the Default Rate, interest on the principal balance of the Loan outstanding from time to time shall accrue from the Closing Date up to and including the Maturity Date at the Applicable Interest Rate.

2.2.2 *Interest Calculation.* Interest on the outstanding principal balance of the Loan shall be calculated by multiplying (a) the actual number of days elapsed in the period for which the calculation is being made by (b) a daily rate based on a three hundred sixty (360) day year (that is, the Applicable Interest Rate or the Default Rate, as then applicable, expressed as an annual rate divided by 360) by (c) the outstanding principal balance.

Section 2.3 of the Construction Loan Agreement is entitled "Loan Payments" and the relevant subsection provides, in pertinent part:

2.3.3 *Interest Rate and Payment After Default.* In the event that, and for so long as, any Event of Default shall have occurred and be continuing, the outstanding principal balance of the Loan and, to the extent permitted by applicable Legal Requirements, overdue interest in respect of the Loan, shall accrue interest at the Default Rate, calculated from the date the Default occurred which led to such Event of Default; provided, however, if such Event of Default consists of a failure to pay interest due on the Loan in accordance with the Loan Documents, then interest at the Default Rate shall not begin to accrue on the Loan on account of such Default until such Default remains uncured for more than fifteen (15) days. . . .

The Debtors argue that these sections do not expressly provide that overdue interest shall be added to the outstanding principal balance at the default rate of interest, resulting in compound interest at the default rate. Thus, the Debtors claim, the agreement is ambiguous as to compound interest, and, because that right is not expressly stated in the agreement, Prudential is not entitled to com-

pound interest. The Debtors are correct that neither of these sections uses the term "compound interest." However, section 2.2.1 provides that interest shall accrue at the "Applicable Interest Rate," and "Applicable Interest Rate" is defined as "9.50% per annum, *compounding monthly.*" (emphasis added). Furthermore, "Default Rate" is defined as "a rate per annum equal to the lesser of (i) the maximum rate permitted by applicable law, or (ii) five percent (5%) above the Applicable Interest Rate." Clearly, the definition of "Default Rate" incorporates the definition of "Applicable Interest Rate." Together, these definitions require that both non-default and default interest be computed on a compounded basis. Section 1.1 of the Construction Loan Agreement defines the term "Loan Documents" to include "this Agreement, the Note," and other documents executed in connection with the loan. Section 2.1.3 of the Construction Loan Agreement describes the Note as the document evidencing the loan to be "repaid in accordance with the terms of this Agreement, the Note, and the other Loan Documents." Neither Prudential nor the Debtors submitted any further documentary evidence to support their arguments on the calculation of interest. Accordingly, the Construction Loan Agreement is the only evidence of the agreement between the parties regarding the calculation of interest and is sufficient evidence of an express agreement between the parties that compound interest would accrue on the Prudential Loan. The Debtors argue and cite authority that it is within a court's discretion to *allow* compound interest in

the absence of an express agreement if warranted by equitable considerations. However, the Debtors cite no authority for the assertion that a court has the discretion to *deny* compound interest where, as in this case, it is expressly provided for in the applicable contract between the parties.

Consequently, we conclude that the bankruptcy court erred in finding that the Construction Loan Agreement did not expressly provide for compound interest and in holding that Prudential was not entitled to postpetition interest computed on a compounded basis.

## III. Whether the Bankruptcy Court Erred in Awarding Prudential Postpetition Interest at the Default Rate.

In their cross-appeals, the Debtors argue that the bankruptcy court erred in granting Prudential postpetition interest at the default rate set forth in the Construction Loan Agreement because the default rate constituted an unenforceable penalty under applicable Massachusetts law.

■ Although § 506(b) entitles Prudential to recover postpetition interest on its claim, § 506(b) and the accompanying legislative history are silent as to the appropriate rate of interest. *Bradford v. Crozier (In re Layman)*, 958 F.2d 72, 74 (5th Cir.1992). Thus, the appropriate rate of postpetition interest is within the limited discretion of the bankruptcy court. *See Key Bank Nat'l Ass'n v. Milham (In re Milham)*, 141 F.3d 420, 423 (2d Cir.1998).[9]

---

**9.** As the Second Circuit has explained:

[S]ection 506(b) does not say that the oversecured creditor collects pendency interest at the contractual rate. In *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989), the Supreme Court held that the

phrase "provided for under the agreement under which such claims arose" does not modify the phrase "interest on such claim." Unlike prepetition interest, pendency interest is not based upon contract. *See Rake v. Wade*, 508 U.S. 464, 468, 113 S.Ct. 2187, 2190, 124 L.Ed.2d 424 (1993) ("[T]he right

Most courts hold that entitlement to default interest is a matter of federal law. *See, e.g., In re Route One West Windsor Ltd. P'ship*, 225 B.R. 76, 86 (Bankr.D.N.J. 1998); *see also Urban Communicators*, 379 B.R. at 254 & n. 76; *In re Consol. Properties Ltd. P'ship*, 152 B.R. 452, 456 (Bankr.D.Md.1993). In *Route One West*, the court observed:

> The allowance of interest on claims in bankruptcy has long been determined by federal law. *Vanston Bondholders Protective Committee v. Green*, 329 U.S. 156, 162–63, 67 S.Ct. 237, 91 L.Ed. 162 (1947). The touchstone of such decisions "has been a balance of equities between creditor and creditor or between creditors and the debtor." *Id.* at 165, 67 S.Ct. 237. The continuing validity of these principles under the Code was acknowledged in *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 248, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989).

225 B.R. at 86.

■ Under federal bankruptcy law, there is a presumption that an oversecured creditor is entitled to postpetition interest at the contractual default rate, provided that there are no equitable considerations that would compel a different result. *See The Southland Corp. v. Toronto–Dominion (In re The Southland Corp.)*, 160 F.3d 1054, 1059–60 (5th Cir.1998) (citing *In re Terry Ltd. Partnership*, 27 F.3d 241, 243–44 (7th Cir.1994)); *Hassen Imports P'ship v. KWP Fin. VI (In re Hassen Imports P'ship)*, 256 B.R. 916, 924 (9th Cir. BAP 2000); *Florida Asset Fin. Corp. v. Dixon (In re Dixon)*, 228 B.R. 166, 172–73

to postpetition interest under § 506(b) is unqualified and exists regardless of whether the agreement giving rise to the claim provides for interest.") (internal quotation marks omitted). The appropriate rate of pendency interest is therefore within the limited discretion of the court. *See In re*

(W.D.Va.1998); *Riley v. Tencara, LLC (In re Wolverine, Proctor & Schwartz)*, 449 B.R. 1, 5 (Bankr.D.Mass.2011); *In re South Canaan Cellular Invs., Inc.*, 427 B.R. 44, 77 (Bankr.E.D.Pa.2010); *Urban Communicators*, 394 B.R. at 338; *In re Route One West*, 225 B.R. at 86. We agree with those decisions.

■ "The effect of the rebuttable presumption in favor of the contract rate is to impose upon the debtor the burden of proving that the equities favor allowing interest at a different rate." *In re Route One West*, 225 B.R. at 87 (citation omitted). As set forth above, the Loan Construction Agreement establishes a non-default rate of 9.50% and a default rate of 5% above the non-default rate. Section 2.3 of the Construction Loan Agreement provides that if an event of default (as defined in the agreement) has occurred, interest shall accrue at the default rate. There is no dispute that an event of default occurred. Therefore, there is a rebuttable presumption that Prudential is entitled to postpetition interest at the default rate, unless the Debtors can prove that there are equitable considerations that compel a different result.

■ Although there is "no clear, emerging, definite enumeration of [the] special circumstances or equitable considerations" which would justify an "equitable deviation" from the contractual default interest rate, *see In re Dixon*, 228 B.R. at 173, several courts have identified a list of factors which may be considered. For example, in *In re General Growth Proper-*

*DeMaggio*, 175 B.R. 144, 148 (Bankr. D.N.H.1994). Most courts have awarded pendency interest at the contractual rate; but nevertheless, however widespread this practice may be, it does not reflect an entitlement to interest at the contractual rate. *In re Milham*, 141 F.3d at 423.

*ties, Inc.,* 451 B.R. 323 (Bankr.S.D.N.Y. 2011) the court stated:

> 11 U.S.C. § 506(b) requires payment of post-petition interest to an oversecured creditor ... and a rebuttable presumption exists favoring the payment of such interest at the contractual rate. Courts in this and other circuits have been reluctant to modify private contractual arrangements imposing default interest rates—particularly in cases involving a solvent debtor—except where: (i) there has been creditor misconduct; (ii) application of the contractual interest rate would cause harm to unsecured creditors; (iii) the contractual interest rate constitutes a penalty; or (iv) its application would impair the debtor's fresh start.

*See In re General Growth Props., Inc.,* No. 09–11977, 2011 WL 2974305, *4 (Bankr. S.D.N.Y. July 20, 2011) (citations omitted); *see also In re Jack Kline Co., Inc.,* 440 B.R. 712, 745 (Bankr.S.D.Tex.2010) (identifying seven factors to be considered). "The power to modify the contract rate based on notions of equity should be exercised sparingly and limited to situations where the secured creditor is guilty of misconduct, the application of the contractual interest rate would harm the unsecured creditors or impair the debtor's fresh start or the contractual interest rate constitutes a penalty." *In re 785 Partners LLC,* 470 B.R. 126 (Bankr.S.D.N.Y.2012) (citing *Urban Communicators,* 394 B.R. at 338; *General Growth,* 451 B.R. at 328; *In re P.G. Realty Co.,* 220 B.R. 773, 780 (Bankr.E.D.N.Y.1998)). The debtor bears the burden of rebutting the presumption that the contract rate applies postpetition. *Id.* (citing *In re The Southland Corp.,* 160 F.3d at 1059–60; *Urban Communicators,* 394 B.R. at 338; *In re Vest Assocs.,* 217 B.R. 696, 702 (Bankr.S.D.N.Y.1998)).

The Debtors have not satisfied this burden. The bankruptcy court in this case employed the four equitable factors outlined in *General Growth Properties, supra,* and found that the contractual default interest rate of 14.5% was the appropriate rate for Prudential's postpetition interest. In making its determination, the bankruptcy court noted that SW Boston was in default under the Loan Construction Agreement as of the petition date. It also found that because the Debtors proposed to pay all creditors in full, other creditors would not be harmed by the payment of postpetition interest at the default rate. Moreover, the bankruptcy court found that although Prudential was litigious during these cases, there was no evidence of misconduct by Prudential. In finding that the default rate was not a penalty, the bankruptcy court pointed to unrebutted evidence through the testimony of Ms. Mulford to the effect that the default interest rate in the Construction Loan Agreement was consistent with the default rates in other loans made and obtained by Prudential. Finally, the bankruptcy court found that allowance of interest at the default rate would not impair the Debtors' ability to reorganize because under the Plan, the Debtors are paying all creditors in full in a relatively short period of time. Thus, the bankruptcy court concluded that a default rate which is 5% higher than the non-default rate was neither a penalty nor inequitable.

Here, there is no cognizable basis in law to disturb the parties' bargain. The Debtors and Prudential were sophisticated parties that entered into a $192.2 million loan agreement. Each was represented by counsel, and there is no evidence of overreaching. They agreed to allocate the risk of default by, among other things, including an unambiguous provision that increased the non-default rate by 5% in the

event of a default. The Debtors' appeal to equitable considerations has no merit.

Consequently, we conclude that the bankruptcy court did not err in awarding Prudential postpetition interest at the default rate set forth in the Construction Loan Agreement.

### CONCLUSION

For the reasons set forth above, we **AFFIRM** the Default Rate Calculation, **REVERSE** the 506(b) Order and the Prudential Claim Order, and **REMAND** both orders for further proceedings consistent with this opinion.